WEST VIRGINIA DEPARTMENT OF HIGHWAYS

*v.*

BERWIND LAND CO.

(No. 14284)

Decided July 17, 1981.

*Jesser & Harrington, Fred A. Jesser, III, Travers R. Harrington, Jr.* and *D. Clinton Gallaher, IV,* for plaintiff in error.

*Marvin W. Masters* for defendant in error.

MCGRAW, JUSTICE:

This case comes before us on appeal from the final order of the Circuit Court of Fayette County which denied a motion for a new trial made by the appellant, Berwind Land Company, at the close of the eminent domain proceedings below. The jury in that case returned a verdict finding the appellant entitled to the sum of $58,500 as just compensation for real property taken by the appellee, the West Virginia Department of Highways, for public road purposes. The appellant's primary assignment of error is the refusal of the trial court to permit the appellant to prove the value of the property taken by offering testimony as to the value of the surface and minerals as separate items. We agree with the appellant's contention that it was entitled to present evidence of the separate value of the

elements, but after a careful review of the record we conclude that such evidence was presented and was in fact before the jury and, therefore, we affirm the judgment of the circuit court denying the motion for a new trial.

The facts giving rise to this dispute are essentially uncontroverted. On April 27, 1963, the West Virginia Department of Highways filed a petition in the Circuit Court of Fayette County to condemn for highway construction purposes real property then owned by the appellant, Berwind Land Company, consisting of approximately 56 acres in fee and a total mineral tract of 17.772 acres. The acquisition of the property by the Department was incidental to the construction of the New River Gorge Bridge and some 1.4 miles of Appalachian Corridor Highway. The Department later filed an amended and supplemental petition and paid into court the sum of $48,800, the amount offered by the Department to the appellant as compensation for the taking of the property, prior to the commencement of eminent domain proceedings. The appellant filed an answer and an amended answer to the petition, alleging that the amount offered by the Department was substantially less than the fair market value of the property and demanding that the property value be determined as provided by law. Upon joint motion of the parties, the circuit court, on October 24, 1974, ordered that the case proceed to trial by jury without a commissioner's hearing.

The first jury trial began on July 2, 1975, but was declared a mistrial upon motion of the Department, on the ground that so much evidence of the separate values of the land and the minerals had been presented that an instruction to the jury would not sufficiently cure the error. A subsequent trial was had on October 13, 1976, during which the trial court refused to permit the appellant to offer certain testimony concerning the separate value of the surface and the minerals with respect to the fee tract. At the conclusion of the evidence, the case was submitted to the jury and a verdict was returned awarding the appellant the sum of $58,500 as just compensation for the property taken by the Department and representing the fair market value of the

land owned in fee and the separate mineral tract as of April 27, 1973. The appellant then filed a motion for a new trial which was denied by the circuit court by order dated January 5, 1978. It is from this order that the appellant appeals.

The appellant asserts that the trial court erred in refusing to permit it to prove the market value of the fee estate by introducing evidence of the separate value of the coal underlying it, thus placing an undue burden on the appellant, which effectively reduced and restricted its proof of damages in violation of Article III, section 9 of the West Virginia Constitution and of the Fifth and Fourteenth Amendments to the Constitution of the United States. The appellant also contends that the trial court erred in restricting its presentation of the value of the minerals taken by eminent domain. It is the appellant's contention that by virtue of these errors committed at trial, it is entitled to a new trial.

The evidence adduced at trial shows that the land which was the subject of the eminent domain proceedings below consisted of 56 acres of land underlaid with coal and other mineral deposits, which were owned in fee by the appellant prior to the taking, and 17.772 acres of minerals, the surface of which was not owned by the appellant. It was established that the coal in both estates is part of the Sewell seam of coal, one of the highest quality metalurgical coal seams in the world. Mining operations to extract the coal from these tracts were first commenced at the beginning of the twentieth century and continued until sometime in the 1920's, at which time the then-owner, New River and Pocahontas Consolidated Coal Company, closed the mine. The Kaymoor No. 2 mine, as it is called, was reconditioned and reopened during the 1940's and coal was mined from the land until sometime in the 1950's when the mine was again closed for economic reasons. Since that time there have been no active mining operations on the land in question.

The appellant's first witness, Virgil Burgess, a mining engineer and longtime employee of Berwind Land Company, testified that the coal on both the fee acreage and the

mineral tract was mineable and that the seam was of an average height of 36 inches. Mr. Burgess testified that the amount of coal remaining in the mineral tract was 20,728 tons and that the fee acreage contained approximately 108,257 tons. He estimated that the value of the coal in the mineral tract at the time of the taking was approximately one dollar per ton, based on a market price per ton of twenty dollars and an expected return of five percent. The appellant's second and third witnesses, who were familiar with land values and appraisals, testified that in their opinion the highest and best use to which the land taken could be put would be residential development and estimated the fair market value of the property to be $212,400 and $264,016, respectively, based on comparable sales of residential property in the area. The next witness, the president of Berwind Land Company, testified that the tracts in question had been mined only partially during the previous mining operations. He testified that in his opinion the coal remaining in the 17.772 acre mineral tract was worth $20,720, based on the amount of coal remaining in that tract at a value of one dollar per ton, but admitted that perhaps only eighty-five percent of that tonnage was recoverable through mining operations. He also testified that the fair market value of the fee acreage was $214,355, although the appellant had valued the property at $10 per acre for tax purposes in 1973. The appellant's final witness was a retired coal operator and consultant who valued the fee tract at $3700 per acre and valued the coal on the 17.772 acre tract at one dollar per ton.

The Department introduced the testimony of one of its employees, a real estate appraiser, to the effect that only part of the fee tract was suitable for residential development and, on the basis of comparable sales, that the market value of the tract was $46,100. This witness also testified that the value of the fee acreage had been enhanced by the proposed highway construction prior to the taking. Another witness, an independent mining engineer who had been hired by the Department to appraise the taken property, testified that the amount of coal recoverable from old mines that are reopened is between 60% and 75% of the

coal in place. He stated that most of the coal originally a part of the land taken had already been mined out by the previous operations and estimated that only 7,400 tons of recoverable coal remained under the mineral tract, the market value of which he placed at $1,100, and that only 48,200 tons remained under the fee tract. He stated that due to deteriorated conditions in the Kaymoor No. 2 mine it would be impossible to mine the coal on the mineral tract and economically unfeasible to mine the coal remaining on the fee tract. He estimated the value of the coal in the mineral tract at the time of the taking at between five to fifteen cents per ton.

The major issue for our determination is whether the trial court erred in refusing to permit the appellant to introduce evidence of the separate value of the minerals underlying the fee tract taken by eminent domain. At first blush, this issue would appear to be controlled by the so-called "unit rule" laid out in syllabus point 8 of *Strouds Creek and Muddlety R.R. Co. v. Herold*, 131 W.Va. 45, 45 S.E.2d 513 (1947).

> In a condemnation proceeding to take land which contains coal as to which there has been no severance of title, evidence offered by the land owner of a separate value of the land apart from the coal and of a separate value of the coal is inadmissible for the purpose of establishing the market value of the land.

The appellant contends, however, that the application of this rule places an undue burden on its ability to prove and justify the fair market value of real property taken by the State for public purposes, effectively reducing and restricting its proof in violation of Article III, section 9 of the West Virginia Constitution and of the Fifth Amendment to the Constitution of the United States. We are asked to overrule the *Strouds Creek* unit rule and to grant the appellant a new trial at which it will be permitted to offer evidence excluded by the trial court.

Before we reach the ultimate issue presented by the appellant, we think it advisable to review the general concepts of compensation in condemnation proceedings

which gave rise to the unit rule formulated in *Strouds Creek, supra.* The Constitution of the United States provides, among other things, "nor shall private property be taken for public use, without just compensation." U.S. Const., Amend. IV. Article III, section 9 of our state constitution provides:

> Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purposes of internal improvement, until just compensation shall have been paid or secured to be paid, to the owner; and when private property shall be taken, or damaged, for public use, or for the use of such corporation, the compensation to the owner shall be ascertained in such manner, as may be prescribed by general law; provided, that when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders.

The determination of what constitutes just compensation "cannot be reduced to inexorable rules", *U.S. v. Toronto, Hamilton and Buffalo Navigation Co.*, 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195, 201 (1949), but as a general rule the measure of compensation to be awarded to one whose property is taken for a public use in a condemnation proceeding is the market value of the property at the time of the taking. *Olson v. U.S.*, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *Strouds Creek and Muddlety R.R. Co. v. Herold, supra; Guyandot Valley Ry. Co. v. Buskirk,* 57 W.Va. 417, 50 S.E. 521, (1905). The market value of the property taken has been defined as

> the price for which the land could be sold in the market by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, and unaffected by compulsion of any kind.

Syl. pt. 5, *Wheeling Electric Co. v. Gist,* 154 W.Va. 69, 173 S.E.2d 336 (1970). Syl. pt. 2, *Guyand of Valley Ry. Co. v. Buskirk, supra; see also Olson v. U.S., supra; U.S. v. 91.90 Acres of Land, etc.,* 586 F.2d 79 (8th Cir. 1978); *State Road Commission v. Board of Park Commissioners of City of*

*Huntington,* 154 W.Va. 159, 173 S.E.2d 919 (1970); *Baltimore & Ohio R.R. Co. v. Bonafield's Heirs,* 79 W.Va. 287, 90 S.E. 868 (1916).

In arriving at a determination of the market value of land taken by eminent domain, the landowner is entitled to have his property valued by reference to the highest and best use to which it may reasonably be put. *U.S. v. 91.90 Acres of Land, etc., supra; Wood v. Wyoming County Court,* 100 W.Va. 29, 129 S.E. 747 (1925); *Norfolk & Western Ry. Co. v. Davis,* 58 W.Va. 620, 52 S.E. 724 (1906). The condemnee is not limited to the use actually being made of the land at the time of the taking but is entitled to consideration of its value for any purpose for which it is then reasonably available in the immediate future. *State Road Commission v. Penndel Co.,* 147 W.Va. 505, 129 S.E.2d 133 (1963); *Monongahela West Penn Public Service Co. v. Monongahela Development Co.,* 101 W.Va. 165, 132 S.E. 380 (1926); *Guyandot Valley Ry. Co. v. Buskirk, supra.* Thus, for the purpose of determining the market value of property taken by eminent domain,

> consideration should be given to every element of value which ordinarily arises in negotiations between private persons with respect to the voluntary sale and purchase of land, the use made of the land at the time . . . it is taken, its suitability for other uses, its adaptability for every useful purpose to which it may be reasonably expected to be immediately devoted, and the most advantageous uses to which it may so be applied.

Syl. pt. 7, in part, *Strouds Creek and Muddlety R.R. Co. v. Herold, supra. See also Olson v. U.S., supra; U.S. v. Carroll,* 304 F.2d 300 (4th Cir. 1962); *Baltimore & Ohio R.R. Co. v. Bonafield's Heirs, supra; Norfolk & Western Ry. Co. v. Davis, supra.*

It was in this context that the unit rule enunciated in *Strouds Creek, supra,* arose. The presence of mineral deposits, sand, clay, gravel, timber or other materials of value in or on the land is an element of value to be considered in arriving at the market value of the property taken by eminent domain. *U.S. v. Whitehurst,* 337 F.2d 765

(4th Cir. 1964); *Wheeling Electric Co. v. Gist, supra; Strouds Creek and Muddlety R.R. Co., supra; Guyandot Valley Ry. Co. v. Buskirk, supra.* Courts had difficulty, however, in permitting land-owners to place a separate value on each element or component of the land taken. On the one hand it was thought that permitting evidence of separate value to be introduced would lead the jury simply to add together all of the values attached to the elements shown to be present in or on the land to reach an amount of just compensation. The so-called "summation method" has been rejected by the vast majority of courts on the ground that it does not relate the separate value of minerals or other components to the total market value and that the market value of the property as a unit might well be less than or greater than the aggregate value of all of its components. *See, e.g., U.S. v. 91.90 Acres of Land, etc., supra; U.S. v. Carroll, supra; Rostine v. City of Hutchinson,* 219 Kan. 320, 548 P.2d 756 (1976); *Alloway v. City of Nashville,* 88 Tenn 510, 13 S.W. 123 (1890); *Wheeling Electric Co. v. Gist, supra.* As one court has noted, "[f]or this purpose, the whole does not necessarily equal the sum of its parts." *Department of Public Works and Buildings v. Lotta,* 27 Ill.2d 455, 456, 189 N.E.2d 238, 240 (1963).

On the other hand, courts found it difficult, if not impossible, to devise a method of valuation which would lead to a precise dollar figure to be attached to separate elements of value which could be relied upon by the jury in fixing the amount of just compensation. The so-called "fixed price per unit method," which involves estimating the number of units of an element in place, e.g., tons, and then multiplying that number by a fixed price per unit, e.g., royalties, was rejected as being predicated on speculation and conjecture. In the early case of *Searle v. Lackawanna and Bloomsburg R.R. Co.,* 33 Pa. 57 (1859), the Pennsylvania court noted that such a method of valuation

> would require us to ascertain the possible value of the products of the land, in order to get at the value of the land itself. But the products do not exist, and therefore have no value, for value here means value in money in the market, and this

cannot apply to products not yet in existence. And then to use the products as a standard of value of the land, is to apply an uncertain measure in order to obtain a certain result. It is easier to value the land directly than thus.

Moreover, the offer [of evidence of separate value] impliedly requires a degree of refinement in the measure of values, which seems to us totally incompatible with the gross estimates of common life. Though we might have the most accurate calculation of the quantity of coal in the land, yet, without knowing exactly the expense of bringing it to the surface and carrying it to market, and the amount likely to be lost in mining and conveying, and the times in which it would be brought out, and the market prices at those times, the quantity would not help us to value the land. The gross estimates of common life are all that courts and juries have skill enough to use as a measure of value. All other measures are necessarily arbitrary and fanciful.

33 Pa. at 64.

Our Court exhibited similar reasoning in the case of *Norfolk & Western Ry. Co. v. Davis, supra,* in rejecting the valuation of coal under the surface of lands by fixing value on the price paid per ton as a royalty in the coal fields being operated. In *Davis,* the court noted:

The coal is of no value while it must remain in the earth; it is the prospect of its production which gives it value. The early prospect of its development is what adds to its value; it is true it has a value now as an investment to be held for future development, and has, as such, a market value, and this market value is the true basis of compensation to be allowed. Coal lands are sold by the acre and have a market value by the acre, and the price is controlled by the various elements of value-the quality of the coal, the thickness of the seam, as well as conveniences and the facilities for conveying it to market.

58 W.Va. at 626, 52 S.E., at 727.

The fixed price per unit method was rejected because it permits the landowner to recover the profits he might realize from mining or leasing the coal for mining purposes without regard to the costs incurred in engaging in such production, which would be a factor in any negotiations for the sale or lease of the property between private parties. *See also U.S. v. Whitehurst, supra.*

The unwillingness of courts to permit the introduction of speculative valuations of the components of the land based on future profits to be realized from the severance of those components from the land without regard to the costs of production and other factors which affect the market price for such products led to the adoption of the unit rule enunciated in *Strouds Creek, supra.*

> To establish the value of the land, the presence of crops, trees, shrubs and timber upon it and of coal, oil, gas, stone and other minerals and valuable deposits upon or under the surface may be shown. The presence, the nature, and the state of development of all these components, contents or elements, whatever they may appropriately be called, are pertinent as bearing upon and tending to establish the market value of the land. Consideration, however, should be confined to the land and its contents and elements together and as an entirety when there is no separate ownership with respect to any of them. The various components, contents and elements are part of and, together with the surface, constitute the land in its entirety as a complete and composite unit. Generally land of the character of that owned by the defendant is sold and has a market value by the acre and the price is affected by the various elements which give it value. The landowner is entitled to consideration of all the advantages which the land possesses, but the only proper inquiry is that which concerns the value of the land as land at the time of the taking. He may not realize on possibilities of increased value of the land except to the extent that they affect its then existing value. (citation omitted.)
>
> 131 W.Va. at 60-61, 45 S.E.2d at 523.

Thus, the unit rule appears to have been formulated in order to avoid the possibility that the jury determination of just compensation to be paid for land taken by eminent domain proceedings would be predicated on speculative evidence not indicative of market value and to reduce the likelihood of speculative estimates of value by landowners which would lead to exorbitant awards of compensation by juries. We concur with the observations of the 7th Circuit that

> [a]ll too frequently, profit seeking motives creep into condemnation cases. This observation, no doubt, will be distasteful to those who envision the public treasury as fair game in such proceedings. Though competitive existence in our society may stimulate such desires, just compensation, only, remains the yardstick in eminent domain proceedings.

*United States v. Merchants Matrix Cut Syndicate*, 219 F.2d 90, 98 (7th Cir.) *cert. denied*, 349 U.S. 945 (1955).

Although the vast majority of jurisdictions still adhere to the precepts of the unit rule, in recent years a trend has developed to modify the harsher aspects of it. The Texas courts seem to have taken the lead in liberalizing the rule to permit, in certain circumstances, the introduction of evidence of separate values of minerals and other components of the land in eminent domain proceedings. In *Brazos River Authority v. Gilliam*, 429 S.W.2d 949 (Tex. Civ. App. 1968), the Texas court held that it was proper to employ a mathematical formula to determine the value of gravel in place and to take such value into consideration with the value of the land to arrive at an ultimate conclusion of correct value of the land as a whole. The Texas court emphasized that mining operations must be considered in determining whether the value of a resource has depreciated.

In the later case of *Coastal Industrial Water Authority v. General Portland Cement Co.*, 523 S.W.2d 462 (Tex. Civ. App. 1975), which involved the condemnation of a tract of land underlaid with clay suitable for the manufacture of cement, the Texas court held that if the quality of a mineral

deposit could be accurately determined, an expert would be allowed to testify to his opinion of the value in place of the material and to multiply that value by the number of extractable cubic yards to determine the value of the mineral in place. It was emphasized by the court, however, that the jury must be informed by an appropriate instruction that they were not permitted to evaluate the clay deposit separately from the other uses of the land, and could not add the value of the clay and the value of the land together to arrive at a determination of the fair market value of the property as a whole. According to the ruling of the court, the value of mineral deposits were to be considered only as elements in determining the market value of the property taken.

Other courts have taken similar approaches. In *State v. Nunes*, 233 Ore. 547, 379 P.2d 579 (1963), the Supreme Court of Oregon held that evidence of the separate value of sand and gravel arrived at by the fixed price per unit method of valuation was admissible as a factor in evaluating the market value of land taken in eminent domain if the landowner refined the computation to include allowances for the costs of operation, variances in the market price and demand for such materials and other factors which would be taken into account by expert appraisers. The court stressed that the value arrived at by using this method cannot be taken as the value of the property but must be used only as a factor in evaluating the land itself. In *State ex rel. State Highway Department v. J.H. Wilkerson & Son, Inc.*, 280 A.2d 700 (Del. Super. 1971), the court approved consideration of the value of mineral deposits, such as gravel, in the ground where due consideration was given to the costs of removal and marketing. The Delaware court expressly stated that evidence of such values was only a factor to be considered in determining the market value of the property and that under no circumstances could the value of the minerals and the land be determined separately and then mechanically added together to arrive at an amount of just compensation. *See also Cade v. United States*, 213 F.2d 138 (4th Cir. 1954); *293.080 Acres of Land, Etc. v. United States*, 169 F. Supp. 305 (D.C. W.D. Penn 1959);

*U.S. v. Land in Dry Bed of Rosamond Lake*, 143 F. Supp. 314, 322 (D.C. Cal 1956); *Consumers Power Co. v. Allegan State Bank*, 20 Mich. App. 720, 174 N.W.2d 578 (1969); *Foster v. Mississippi State Highway Comm.*, 140 So.2d 267 (Miss. 1962); *Dow v. State*, 107 N.H. 512, 226 A.2d 92 (1967); *State v. Noble*, 8 Utah.2d 405, 335 P.2d 831 (1959); *State v. Mottman Mercantile Co.*, 51 Wash.2d 722, 321 P.2d 912 (1958).

We are in agreement with the trend towards liberalizing the unit rule revealed by these decisions. They lend support to the conclusion of one commentator that

> [a] hybrid of [the unit rule and the summation method] would provide a more rational rule, *i.e.*, separate valuations of timber, minerals, and the like, should be admissible evidence provided safe-guarding instructions are given informing the jury that such evidence may be considered as a *factor* in arriving at a final award, along with other evidence, but that it is improper for the jury to simply add the separate value estimates together in ascertaining just compensation. (Emphasis added).

Note, *Eminent Domain: Approaches to Valuation of Real Estate with Emphasis on Mineral Properties*, 74 W.Va. L.Rev. 307, 324-325 (1971-1972). Such an approach, although imperfect, appears to be less speculative than simply placing evidence of the presence and quality of minerals or other elements of value before the jury and leaving them to arrive at some figure of just compensation without any indication of the extent to which those elements enhance the market value of the land. It must be remembered that the appraisal of real property is a very technical and complex area, particularly with respect to the valuation of minerals in place. *See Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165 (1979). Valuation of real property involves a considerable amount of guesswork and cannot be reduced to an exact science. "[N]o piece of property, especially if it be mineral land, has a specific and definite value and so, to some degree, 'speculation' must be indulged in." *United States v. 180.37 Acres of Land Etc.*, 254 F. Supp. 678, 681 (W.D. Va. 1966). In arriving at an estimate of the value of

land for purposes of determining the amount of just compensation to be awarded a landowner for the condemnation of his land, courts can only insure that the most precise method of valuation available is used, imperfect though it may be.

Our departure from the unit rule is not as revolutionary as it might appear to some. In *Strouds Creek* and its progeny we have repeatedly emphasized that property must be valued as land with consideration of the value of the components of the land limited to their existence, nature, and state of development to the extent that these components enhance the market value of the land as a whole. Basically this version of the unit rule has stood for the proposition that evidence of value adduced by other means would be speculative and thus inadmissible to prove the actual fair market value of the property taken. Understandably this Court was unwilling to construct a rule whereby a landowner might claim compensation for every component or element of value without regard to its basis in fact.

However, we have also recognized and held in a parallel line of cases that evidence of the separate values of land and of buildings or fixtures thereon is admissible to prove the market value of property taken. In *Baltimore & Ohio Railroad Co. v. Bonafield's Heirs*, 79 W.Va. 287, 90 S.E. 868 (1916), an action for damages accruing to the residue of an estate partially condemned for a railroad right-of-way, the Court stated that:

> In ascertaining the damages to defendants' building it was proper to take into consideration its value, the more valuable it was the greater would be the damage to it; and, in ascertaining its value, evidence of the original cost of its construction could properly be considered, notwithstanding it had been built some years before this proceeding was instituted, but the probative value of such evidence depends upon the extent of deterioration of the building, if any, and the comparative cost of labor and material now, and at the time the building was erected.
>
> 79 W.Va. at 296, 90 S.E. at 871.

One year after *Strouds Creek* was decided, the Court, in *State v. Evans*, 131 W.Va. 744, 50 S.E.2d 485 (1948), held that evidence of the cost of reconstructing a garage located upon land taken for a highway right-of-way was admissible to show the market value of the property:

> [I]t, is not error to permit a witness to analyze the figure given by him as the market value and in doing so to state his opinion as to the value of the items going to make up the whole. Consequently the cost of reconstructing the garage, by itself and standing alone, would not have been properly admitted as a distinct item of damages. However, as one of the ingredients going to make up market value of property taken, we believe that it was admissible. As a separate element of recovery it should have been excluded, but if used to sustain and bolster evidence of market value given on behalf of the defendant, as here, we believe that its proper relevance is inescapable. . . As a means of arriving at the market value of the land taken the replacement cost of buildings taken may be shown as enhancing the market value of the land.
>
> 131 W.Va. at 742, 50 S.E.2d at 486-487.

Separate valuation of improvements was also held to be admissible in the case of *Chesapeake & Ohio R. Co. v. Johnson*, 134 W.Va. 619, 60 S.E.2d 203 (1950), where the Court held:

> The sound rule to be applied to reproduction or replacement cost of a suitable building or improvement taken or destroyed, considered as part of the land itself, is that it may be given in evidence as one of the elements which is included in the market value of the land taken, if such cost is considered in connection with the age of such building or improvement, and is depreciated to the extent that it will equal or represent the value of the building or the improvement taken or destroyed as part of the market value of the land taken.
>
> 134 W.Va. at 629, 60 S.E.2d at 209-210.

We see no reason why evidence of the separate value of minerals underlying a fee estate taken by eminent domain

should not be admissible to prove the market value of the land taken.

> "[W]e know of no other evidence by which the jury could be properly guided in determining the value of the property than to be told the per ton value of the sand as it lay, or, without this knowledge, how the jury could ever have reached a judgment based on anything more than guess or speculation."

*National Brick Co. v. United States*, 131 F.2d 30, 31 (D.C. Cir. 1942). Methods of measuring the quantity and quality of minerals in place have been refined greatly since the time of *Searle v. Lackawanna and Bloomsburg R.R. Co., supra.* *See Werner v. Commonwealth*, 432 Pa. 280, 247 A.2d 444 (1968). Moreover, implicit in the court's ruling in *Strouds Creek* was the idea that the evidentiary restrictions of the unit rule upon proving the separate value of minerals in a fee estate did not apply to proving the value of minerals in a severed estate. Presumably the court was of the opinion that using the fixed price per unit method in the latter instance was not so speculative as to mislead the jury into arriving at a figure of compensation which did not represent the market value of the mineral estate.

It is our opinion that the aura emanating from the *Strouds Creek* decision has been distorted somewhat since 1947 by the inconsistencies that have arisen in the operation of the rule and by the developments in mineral resource technology for determining the amount and value of any marketable resource. In effect, these developments have tended to undermine the rationale upon which the unit rule was first premised. The degree of uncertainty inherent in the operation of the rule today is not justified in view of our ability to provide the jury with a more accurate method of calculating the fair market value of property owned in fee. We conclude, therefore, that if the existence and quantity of minerals or other elements of value in a fee estate can be accurately determined, an expert witness may testify to his opinion of the value in place of one unit of that element and multiply it by the quantity of that resource present in or on the land to determine the value of the element in place. *See Coastal*

*Industry Water Authority v. Trinity Portland Cement Division, etc., supra.*

We do not suggest, nor do we hold, however, that in all cases the value of an element determined by such a method may be added together with the value of the surface of the land to arrive at the market value of the property for purposes of determining the amount of just compensation to be awarded to the landowner for the taking of the condemned property. We hold only that evidence of the value of elements such as minerals, timber and the like, in place on condemned land is admissible to show the market value of the land so long as they are in harmony with the other factors that are utilized in arriving at the market value at the time of the take.

Another important consideration in valuing minerals in place is the cost of extracting or producing the minerals. Just as evidence of the replacement value of buildings or improvements on condemned land must be reduced by the amount of depreciation so as to represent the value of the building or improvement at the time of the taking, *Chesapeake & Ohio R. Co. v. Johnson, supra,* so, too, must evidence of the value of minerals underlying a condemned fee estate be tempered by evidence of the expense of actually producing the mineral product. The reason is the same.

> The landowner should be made whole by compensation for the value of the building taken, as an element of the market value of the land in its entirety, but he should not be awarded the value of a new building for the old building taken or destroyed. He should not be enriched to the extent of the difference between the fair value of the old building and the undepreciated reproduction cost of a new building in its stead.
>
> *Id.* at 210.

Nor should a landowner be compensated for minerals taken by eminent domain where there is so little of the mineral present in or on the land taken as to be unmineable or where the cost of producing the mineral is so high that it is economically unfeasible to extract it. In *Atwater & Co.*

*v. Collieries Co.*, 119 W.Va. 549, 556, 195 S.E. 99, 102 (1937), this Court rejected the notion that "minable coal" is any coal that can be mined, regardless of costs, preferring instead to define minable coal as that which "could be profitably mined by judicious methods." Before a jury may consider evidence of the value of an element of land taken by eminent domain in arriving at the market value of the land, it must appear that such element is clearly significant in that the production and marketing of that element would result in a meaningful benefit to the landowner.

Finally, we think consideration must be given to the extent to which the use of the property for purposes of producing an element of value contained on the land is inconsistent with the other uses of the land for which the landowner claims compensation. As we have already noted the condemnee is entitled to have his property valued by reference to the highest and best use to which it can be put. The landowner is not limited to the use actually being made of the land at the time of the taking but is entitled to consideration of its value for any purpose for which it is then reasonably available in the immediate future. *State Road Commission v. Penndel, supra.* For the purpose of determining the market value of property taken by eminent domain,

> [c]onsideration should be given to every element of value which ordinarily arises in negotiations between private persons with respect to the voluntary sale and purchase of land, the use made of the land at the time . . . it is taken, its *suitability for other uses, its adaptability for every useful purpose to which it may be devoted, and the most advantageous uses to which it may so be applied.* (Emphasis added.)

Syl. pt. 7, in part, *Strouds Creek and Muddelty R.R. Co. v. Herold, supra.* Thus, where land taken is suitable for more than one use and those uses are compatible with each other so that utilization of the property for one purpose does not interfere with its use for another purpose, each consistent use is an element of value which goes to make up the market value of the land and should be considered in

arriving at an amount of just compensation. *See Monongahela West Penn Public Service Co. v. Monongahela Development Co., supra.*

Where, however, the land sought to be taken is valuable for more than one purpose, but the use of the land for one purpose is inconsistent or incompatible with its use for other purposes, the condemnee is not entitled to be compensated for all prospective uses of the condemned property. Syl. pt. 4, *Monongahela West Penn Service Co. v. Monongahela Development Co., supra.* For example, condemned land may be suitable for either surface mining or residential development, but clearly not suitable for both uses at the same time. Because use of the property for one purpose is totally inconsistent with its use for the other purpose, the landowner is entitled to recover for the more valuable use but cannot recover for both uses. *See Montana Ry. Co. v. Warren*, 6 Mont. 275, 12 P.641 (1887), *aff'd* 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890); *Monongahela West Penn Public Service Co. v. Monongahela Development Co., supra*; Annot., 156 A.L.R. 1416. Thus, under our modified unit rule before the value of an element can be considered in determining the fair market value of land, it must be shown to be compatible with the highest and best use of the property taken. Where it is shown that an element can be accurately determined and is clearly significant in value, but is incompatible with the highest and best use, that element is, in effect, subservient to the higher or dominant use.

This is not to say that incompatible uses are to be treated as mutually exclusive. The suitability of the land for other, inconsistent uses may well be an element of value which enhances the market value of the property as a whole. In such instances, the value of the subservient use may be introduced into evidence as a factor affecting the market value of the property if it is accompanied by evidence of the extent to which the value of that element as a use for the land is diminished insofar as it interferes or is incompatible with the highest and best use. Thus, if the landowner seeks to introduce evidence of the value of the land for residential development where it has been shown that the highest and

best use of the land is the mining of coal, the evidence must show the extent to which the value of the surface is depreciated by the mining operations in order to arrive at the correct value. *Brazos River Authority v. Gilliam, supra.*

In summary, our modification of the unit rule enunciated in *Strouds Creek, supra,* permits the owner of fee property taken by eminent domain to prove the market value of the land by introducing evidence of the separate value of the elements present in or on the land when it can be shown that (1) the existence and quantity of the element of value can be accurately determined, (2) other factors, such as the expense of production and marketing, were taken into consideration in arriving at the value sought to be introduced, (3) the element is clearly significant in value, and (4) the use of the property for purposes of exploiting that element of value is not inconsistent or incompatible with the highest and best use to which the property may be put or that the subservient use has been devalued to the degree it interferes with the highest and best use of the property taken. The jury should be instructed that the evidence of separate values is only a factor to be considered in determining the total market value of the land; to the extent such separate values are inconsistent with the highest and best use of the land they should be disregarded in arriving at the figure of just compensation.

We turn now to the case at hand and apply these principles to the evidence adduced at trial in order to determine whether the erroneous adherence of the trial court to the *Strouds Creek* unit rule resulted in prejudice to the appellant's case.

The appellant contends that the failure of the trial court to allow the admission of evidence as to the value of the coal in the fee estate resulted in a determination of market value by the jury which could only be based upon speculation and conjecture. A careful review of the evidence reveals that the appellant's expert was questioned first about the mineral tract and testified as to the estimated amount of coal in place and attached a per ton value on that coal. He immediately thereafter gave his estimate of the amount of coal in place under the fee estate.

Although he was not permitted to testify as to the value per ton of the coal underlying the fee estate, it was made clear that both tracts shared the same seam of coal. There is ample evidence in the record of sufficient probative force and effect to indicate that the appellant was given a fair opportunity to present its claim.

Evidence was also introduced by the State through cross-examination to indicate that the coal underlying the fee estate had been "mined out" by prior mining operations and that the pillars of coal remaining would not be profitable to mine. Moreover, the use of the property for mining was probably incompatible with the highest and best use of the property, shown by the appellant's evidence to be for residential purposes. Extracting the coal remaining in the pillars may well have caused subsidence of the surface, destroying or decreasing its value for residential purposes. The jury could well have rejected the coal deposits underlying the fee estate as a value factor due to this inconsistency of use.

We also note that the appellant's evidence of the market value of the surface was contradicted by the State's introduction into evidence of the property tax return filed by the corporate landowner in 1973 which valued the land at approximately $10 per acre. W.Va. Code § 11-3-12 (1974 Replacement Vol.) requires a corporate landowner to file annually a verified report of "the true and actual value" of real property owned by the corporation with the county assessor. Obviously, the introduction of this evidence may have led the jury to discount the testimony of the appellant's witnesses that the market value of the fee property was between $212,000 and $264,000.

After carefully examining the record below, we conclude that the appellant's claim is without merit. It seems clear to us that although the trial court excluded evidence of the value of the coal beneath the fee estate, there was evidence before the jury of the value of the coal. When this evidence is coupled with the evidence of the possible inconsistency of using the property for coal mining in relation to its use

for residential purposes and the effect of that inconsistent use on the ultimate market value of the property, we conclude that the appellant was afforded the benefits of the rule laid down in this case. Any error resulting from the exclusion of value was harmless and does not appear to us to have resulted in an inadequate jury verdict.

For the reasons stated herein, we affirm the judgment of the Circuit Court of Fayette County which denied the appellant's motion for a new trial.

*Affirmed.*