352 S.E.2d 134

**WEST VIRGINIA DEPARTMENT OF HIGHWAYS, a Corporation, and William S. Ritchie, Jr., Commissioner**

v.

**Louis RODA and Mary Roda.**

No. 16772.

Supreme Court of Appeals
of West Virginia.

Dec. 19, 1986.

Paul E. Parker, Jr., Fairmont, for appellants.

David J. Romano, Clarksburg, for appellees.

McHUGH, Justice:

This case is before this Court upon appeal from the final order of the Circuit Court of Harrison County which denied a motion to set aside the verdict and to grant a new trial made by the West Virginia Department of Highways at the close of eminent domain proceedings below. The jury returned a verdict finding the landowners entitled to the sum of $890,136.00 as just compensation for coal taken by the Department of Highways for public road purposes. This Court has before it the petition for appeal, ·all matters of record and briefs of counsel.

Appellants are the West Virginia Department of Highways and its Commissioner, William S. Ritchie, Jr.

Appellees are Louis Roda and his wife, Mary Roda, owners' of the coal which the Department of Highways has condemned.

## I

The facts giving rise to this dispute are essentially uncontroverted.

The acquisition of the property was essential to the construction of Interstate 79 and the relocation of U.S. Route 50.[1] Although the West Virginia Department of Highways had examined title to the property, appraised the landowners interest and communicated its intention to acquire those interests, excavation of certain coal belonging to the Rodas began before the requisite interests had been obtained by the Department of Highways. The eminent domain proceedings, pursuant to W. Va. Code, 54-2-14a [1963], were instituted on August 1, 1974. One day earlier, the Rodas had sought an injunction to halt the removal and sale of their coal by the contractor which was constructing the project for the Department of Highways. Subsequent to the institution of lawful condemnation proceedings, however, the excavation continued, and the highway construction was completed. Because the Department of Highways estimated that the coal had no value, no sum was paid into court prior to taking possession of the coal.

The dispute between the parties relates to the value of the coal condemned by the Department of Highways. Prior to trial, the court granted the landowners' motion in limine which, in effect, prevented the Department of Highways from eliciting testimony or mentioning in arguments the value of the coal in its condition prior to August 1, 1974, the date of condemnation. The court ruled that just compensation was the fair market value of all coal, whether removed before August 1, 1974, or thereafter, considered to be uncovered, "in the pit," ready for loading, with no consideration of the production, mining or excavation costs.

On July 16, 1984, nearly ten years after lawful condemnation proceedings were instituted, the case proceeded to trial. The evidence adduced at trial established that the coal which was the subject of the eminent domain proceedings below consisted of 9.8 acres of Pittsburgh coal and 6.4 acres of Redstone coal, for a total take of 16.2 acres. Of the Rodas' coal property condemned in this proceeding, 4.8 acres of the Redstone coal was actually removed and sold by the contractor prior to the initiation of condemnation proceedings. The contractor had completely excavated or removed and sold 2.9 acres of Pittsburgh coal at the time condemnation proceedings had been instituted. It was established that the market conditions for both the Pittsburgh and Redstone seams were excellent on August 1, 1974.

The landowners introduced the testimony of their surveyor, Raymond Stiles, to establish the acreages of Pittsburgh and Redstone coal seams which the Department of Highways had appropriated, as well as the acreages of the coal removed by the contractor during the excavation. Mr. Roda himself testified that the fair market value of the unearthed coal, in its condition on August 1, 1974, was $1,430,000. Testimony from several witnesses knowledgeable in the area of coal valuation demonstrated that the fair market value of one ton of coal in its condition on August 1, 1974, ranged from $24.00 to $33.25. The landowners' witness, Donald Sult, determined the quantity of coal actually removed from the take area. Based upon Mr. Sult's engineering estimates, the landowners' final witness, Nicholas Stevens, opined that the fair market value of the excavated coal in the road cut area was $1,839,789.

The Department's first witness, Harry Looker, a project engineer for the Department, described his observations of the coal during the excavation process including mine voids, mine rails and timbers. He also acknowledged that the Department of Highways' contractor removed and sold the Pittsburgh coal and also sold the Redstone

---

1. Although these proceedings were instituted pursuant to W. Va. Code, 54-2-14a [1963], discussed infra, condemnation awards such as the one herein are funded at least 90% by federal appropriations. See 23 U.S.C. § 107(a)(2) (1958).

coal. The Department of Highways' second witness, Paul Horner, a mining engineer who had originally appraised the fair market value of the condemned coal, testified that he "did not find any value to either one of the veins of coal." This offer of opinion was rejected by the court based on its earlier ruling that testimony regarding the value of the coal prior to August 1, 1974, would not be admissible. Another witness, Donald Bondurant, a mining engineer, concluded that 7946 tons of Pittsburgh coal were recoverable by surface mining, while the Redstone coal was not recoverable at all. He testified that in his opinion the coal was worth $.96 a ton in its condition on August 1, 1974. Consistent with the opinion of Paul Horner, the witness indicated the possibility that the coal was worthless.

At the conclusion of these proceedings, the jury returned a verdict for the landowners finding just compensation for the coal taken by the Department of Highways to be $890,136.00.

## II

The initial issue for this Court to resolve is the appropriate date upon which the landowners' property should be valued for purposes of ascertaining just compensation to the landowners for the coal taken.

Provisions of our federal and state constitutions ensure that private property shall not be taken for public use without just compensation. *U.S. Const.* amend. V; *W.Va. Const.* article III, § 9.

The Department of Highways proceeded under *W.Va.Code*, 54-2-14a [1963], which allows the State to acquire "title to, and enter upon, take possession of, appropriate and use the property, or interest or right therein, sought to be condemned" upon the filing of a petition and payment into court of "such sum as it [condemnor] shall estimate to be the fair value of the property, or estate, right, or interest therein, sought to be condemned, including, where applicable, the damages, if any to the residue...." No funds were deposited because the Department of Highways estimated that the coal had no value.

◼ Generally, the measure of compensation to be awarded one whose property is taken for a public use in a condemnation proceeding is the market value of the property at the time of the taking. *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236, 1244 (1934); *West Virginia Department of Highways v. Berwind Land Co.*, 167 W.Va. 726, 732, 280 S.E.2d 609, 613 (1981); *Strouds Creek & M.R.R. v. Herold*, 131 W.Va. 45, 53, 45 S.E.2d 513, 519 (1947); *Guyandot Valley Ry. v. Buskirk*, 57 W.Va. 417, 424, 50 S.E. 521, 523 (1905).

No cases in West Virginia regarding value have been brought to our attention where the condemnor entered upon and appropriated the condemnee's property without legal authority initially and at a later date instituted lawful condemnation proceedings. In any event, the parties do not dispute that August 1, 1974 is the lawful date of take.

The Supreme Court of Virginia has held that the date of take, which determines the date upon which condemned property is to be valued, is the date when the property is lawfully condemned and not the date when the State may have wrongfully acquired possession of the condemnee's property. *White v. State Highway Commissioner*, 201 Va. 885, 114 S.E.2d 614 (1960). The *White* case involved the construction of a highway across the plaintiff's lots. Acting under a mistake of title, the highway commissioner neglected to obtain the plaintiff's interests before appropriating the land. Fifteen years later, upon discovery of the error, the commissioner instituted lawful condemnation proceedings. Just compensation was found to be the value of the land on the date the condemnation proceedings were initiated rather than the date of physical invasion some fifteen years earlier.

Other jurisdictions have held that the date of take is the date upon which the property is lawfully condemned. *Department of Transportation v. LaSalle National Bank*, 102 Ill.App.3d 1093, 58 Ill. Dec. 344, 430 N.E.2d 286 (1981); *Saratoga*

*County Sewer Dist. # 1 v. Stevenson,* 100 Misc.2d 863, 420 N.Y.S.2d 190 (Saratoga County Ct.1979); *Langenheim v. City of Seward,* 200 Neb. 740, 265 N.W.2d 446 (1978); *City of New Orleans v. Giraud,* 346 So.2d 1113 (La.App.1977). As is stated in a leading treatise on eminent domain law,

> [t]he rule that damages are to be assessed as of the date of the taking does not contemplate a physical taking not sanctioned by law, but a taking by appropriate legal proceedings; and consequently, if a corporation invested with the power of eminent domain takes possession of private property in advance of condemnation proceedings, it cannot insist that the compensation awarded in the condemnation proceedings be fixed as of the date of unlawful entry, ...

3 J. Sackman, *Nichols' The Law of Eminent Domain,* § 8.5[3] at 8–115 (1985).

In a case decided under a predecessor to *W.Va.Code,* 54–2–14a [1963], this Court determined that the date of the actual taking of land is the date when, after the report of the commissioners, or after verdict, if a jury was demanded, the money is actually paid to the owner or to the court. *Buckhannon & N.R.R. v. Great Scott Coal & Coke Co.,* 75 W.Va. 423–31, 83 S.E. 1031–34 (1914).[2]

■ Based upon the above principles, we hold that in eminent domain proceedings, the date of take for the purpose of determining the fair market value of property for the fixing of compensation to be made to the condemnee is the date on which the property is lawfully taken by the commencement of appropriate legal proceedings pursuant to *W.Va.Code,* 54–2–14a, as amended. Therefore, the date of take was August 1, 1974, the date that condemnation proceedings were instituted by the Department of Highways.

### III

The major issue for our determination is whether the trial court erred in holding that just compensation for the landowners' coal was the fair market value of all the coal, whether removed before or after August 1, 1974, considered to be uncovered, in the pit, ready for loading, with no consideration of production, mining, excavation or marketing costs.

*W.Va. Const.* article III, § 9 provides in pertinent part that "Private property shall not be taken or damaged for public use ... until just compensation shall have been paid or secured to be paid to the owner...." The above provision is "designed to protect people from government." *Pittsburgh Elevator Co. v. West Virginia Board of Regents,* 172 W.Va. 743, 754, 310 S.E.2d 675, 686 (1983).

■ In implementing the preceding constitutional mandate, this Court has required that condemnors strictly follow proper statutory procedures before appropriating private property or else suffer the consequences of their action by exposing themselves to injunction, damage, or mandamus actions. *Stewart v. State Road Commission,* 117 W.Va. 352, 353–54, 185 S.E. 567, 567–68 (1936). This Court has recognized the sanctity accorded the own-

---

**2.** The Court in *Buckhannon & N.R.R.* applied the operative statute at the time the case was brought before the Court which differs somewhat from the statute now before us. The statute involved in that case provided that five disinterested freeholders be appointed as commissioners to ascertain just compensation for the property taken. It further vested in the courts the power to empanel jurors to determine compensation, should either one of the parties request a jury. 1875 *W.Va.Acts,* ch. 114, § 11; see also *W.Va.Code,* 54–2–5 [1931] and *W.Va.Code,* 54–2–10 [1967], respectively.

The statute also provided:

After such report [of the commissioners] has once been made, ... whether a trial by jury be demanded and had or not, the applicant upon paying into the court the sum ascertained by such report, with legal interest thereon from the date of the report until payment, may notwithstanding the pendency of further proceedings, enter upon, take and use for the purposes specified in the application, that part of land in respect to which such payment is made....

1875 *W.Va.Acts,* ch. 114, § 21.

That statute is no longer controlling. See *W.Va.Code,* 54–2–14a [1963], an alternative to *W.Va.Code,* 54–2–14 [1975], which the State may use to lawfully condemn private property.

ership of private property. *Id.*, 117 W.Va. at 353, 185 S.E. at 567. Strict compliance has traditionally been required before the condemnor is "permitted to put a foot on the ground." *Buckhannon & N.R.R. v. Great Scott Coal & Coke Co.*, 75 W.Va. 423, 431, 83 S.E. 1031, 1034 (1914). Clearly, there is a strong public policy in this State which requires that condemnors strictly adhere to prescribed statutory procedures before appropriating private property for public use.

In the case before us, the critical issue for the jury was the determination of the fair market value of the landowners' coal in the condition in which it existed on the date of take. The court read to the jury the following instruction regarding the proper valuation of the coal:

> Prior to August 1, 1974 the legal title to the Redstone and Pitts[burgh] coal was in the Landowners and the Landowners owning the coal had the right to sell it if they desired; therefore, the Court instructs the jury that just compensation is to be determined as of the date of actual initiation of condemnation proceedings by the Department of Highways, that is, August 1, 1974, and you the jury must determine the fair market value of the Landowners coal property as of this date, in the condition that the coal existed at this time. In other words, at the time of taking by the Department of Highways, if the Landowners coal had been uncovered or removed, then you must arrive at the fair market value of said coal as it existed in that condition on August 1, 1974. If you determine that some of the coal had been removed from the property prior to August 1, 1974, then the Landowners are entitled to the fair market value of such coal taken and removed as of August 1, 1974.

The Department of Highways objected to the above instruction contending that it was contrary to law because it limited consideration of the coal to its condition as uncovered or removed, thereby omitting certain costs, such as production and marketing, in ascertaining the fair market value of the coal. *See* syl. pt. 2, *West Virginia Department of Highways v. Berwind Land Co.*, 167 W.Va. 726, 280 S.E.2d 609 (1981).

The case now before us is unusual in that the Department of Highways entered the landowners' property with full knowledge of the Rodas' property interests yet without legal authorization. In such a case, the rules ordinarily applicable in condemnation proceedings do not apply. *See Pierpont Inn, Inc. v. State*, 70 Cal.2d 282, 290, 74 Cal.Rptr. 521, 527, 449 P.2d 737, 743 (1969).

■ This case is distinguishable from the facts presented to us in *Berwind* in that it is similar to an action in willful trespass. The Department of Highways, through its contractor, willfully encroached on the landowners property, mining and removing coal in bad faith.[3] Where a trespass is willful, the trespasser shall pay the full value of the mineral at the time he sells or uses it. *Mullins v. Clinchfield Coal Corp.*, 227 F.2d 881, 885 (4th Cir. 1955); *Payne v. Consolidated Coal Corp.*, 607 F.Supp. 378 (W.D.Va.1985).

■ This Court has held that the actual damage or destruction of real estate may be determined by proving the market value of the property. *Stenger v. Hope Natural Gas Co.*, 139 W.Va. 549, 562, 80 S.E.2d 889, 897 (1954). We have further indicated that the amount of compensation for property taken in condemnation proceedings is determined by the fair market value of the land at the time it is taken. *Strouds Creek & M.R.R. v. Herold*, 131 W.Va. 45, 53, 45 S.E.2d 513, 519 (1947). Thus, when the contractor for the Department of Highways took the landowners' property prior to the institution of lawful condemnation proceedings, the trial judge did not err in

---

**3.** The Department of Highways states that taxpayers should not subsidize the landowners in this case. Of interest, however, is the amount accruing to the benefit of the contractor. In the summer of 1974, before the lawful date of take, two witnesses testified that they had purchased substantial quantities of coal from the contractor. One coal purchaser, Archie Elkins, testified that his company alone paid $1,117,580.00 for coal purchased from the road cut area.

refusing to allow the introduction of evidence as to the value of such property on a date prior to the institution of such proceedings.

A case factually similar to the one now before us, *Smithrock Quarry, Inc. v. State,* 60 Wash.2d 387, 374 P.2d 168 (1962), involved an action to recover compensation for an alleged taking of the plaintiff's rights in a rock quarry. Like some of the landowners' coal, the materials had been severed and essentially reduced to personal property. At the time of lawful taking, there was an existing market for the severed materials in their present condition. The court determined that "[t]here [was] nothing left to be done but to convey title and accept the purchase price." 60 Wash.2d at 389, 374 P.2d at 170. Witnesses testified that the rock could have been sold at the site of condemnation for a definite price per cubic yard. The court further reasoned that because a market for the rock existed in the place where it was located, the cost of marketing should not be deducted from the fair market value of the material since no marketing costs were incurred. The court upheld the jury verdict which found the damages equal to the value of the rock materials which had been severed and which could have been sold on the date of taking.

An early Pennsylvania decision is in accord with the principles developed in the *Smithrock Quarry* case. In *Cole v. Ellwood Power Co.,* 216 Pa. 283, 65 A. 678 (1907), the court determined that stone severed from a cliffside before the condemnor had appropriated the mineral estate was valued at the place of its location when the appropriation was made. The Michigan Court of Appeals in *In Re Mackie,* 2 Mich. App. 698, 141 N.W.2d 312 (1966), held that where mineral deposits are the subject of condemnation proceedings, the deposit is to be treated as personalty rather than as land. The court ruled that the condemnor was liable for the market value of the mineral deposit as separately evaluated because the rule applicable to personal property was invoked when the minerals had been severed from the land.

Based upon the reasoning of this line of cases, we conclude that the trial judge did not err in his approach to ascertaining just compensation.

The above cited cases are persuasive in developing the principle to be applied in this case. Some of the coal was removed from the land prior to the initiation of appropriate legal proceedings. Once severed, the coal had, in effect, been reduced to personalty. Further, on the lawful date of take, according to the testimony, an excellent market existed for both the unearthed coal and the coal in place. Thus, pursuant to the rationale in *Smithrock Quarry, Inc. v. State, supra,* marketing costs should not be offset from the fair market value of the coal because testimony at trial established that there was such an excellent market.

The case of *Pierpont Inn, Inc. v. State,* 70 Cal.2d 282, 74 Cal.Rptr. 521, 449 P.2d 737 (1969), involved a strip of land necessary for the construction of a freeway. The Department of Highways appropriated the land without instituting lawful condemnation proceedings, although it was fully aware of the condemnee's interest in the property when it appropriated it. The court in *Pierpont* stated:

> [W]hen the appellant [State] in the instant action, with full knowledge of the respondent's asserted rights in the premises, determined to proceed without exercising its powers of eminent domain in the manner prescribed by law, it cannot be heard to complain that the rules applicable to ordinary condemnation proceedings were not applied to the instant action which it forced upon respondent [condemnee].

70 Cal.2d at 290, 74 Cal.Rptr. at 527, 449 P.2d at 743.

In the case now before us, the landowners informed the Department of Highways of their interest in the coal before it was removed and sold by the contractor. Their complaints were ignored by the Department of Highways until the landowners sought injunctive relief to halt the unlawful appropriation of their land.

The Department of Highways contends that the landowners have unjustly benefitted by a valuation date of August 1, 1974. Where do the equities lie? The Department of Highways could have adhered to the statutory mandates of *W.Va.Code*, 54–2–14a [1963] by condemning the coal prior to its appropriation and thus fixing its value prior to the actual removal. The entire conflict could have been avoided had the Department of Highways adhered to the statutory mandates by condemning the coal before appropriating it. We further note that the landowner apparently sought permission to remove the coal once it had been uncovered. The Department of Highways refused this request.

The benefit to the landowners because of the excavation which occurred prior to lawful condemnation should not be offset in the consideration of the value of the landowners' coal on August 1, 1974. In *McChristy v. Hall County*, 140 S.W.2d 576, 579 (Tex.Civ.App.1940), the Texas court stated:

> The benefits and enhancements in value that had already accrued on account of the previous improvements of the enterprise that had already been initiated to establish and build the road are not to be considered as offsets when subsequent condemnations are instituted. The owner is entitled to such compensation as is warranted by the facts shown to exist at the time the land is taken.

The *McChristy* analysis is appropriate in fashioning a fair result in this case. Thus, costs incurred in removing, mining and excavating the landowners' coal should not be offset in this case. The value of condemned property is to be determined on the date, and under the circumstances existing at the time, of the taking. *See Redevelopment Agency v. Mitsui Investment, Inc.*, 522 P.2d 1370, 1373 (Utah 1974).

The market value of condemned property in eminent domain proceedings has been defined as follows: "The market value in such case is the price for which the land could be sold in the market by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, and unaffected by compulsion of any kind." Syl. pt. 5, *Wheeling Electric Co. v. Gist*, 154 W.Va. 69, 173 S.E.2d 336 (1970). *See also* syl. pt. 2, *Guyandot Valley Ry. v. Buskirk*, 57 W.Va. 417, 50 S.E. 521 (1905); *West Virginia Department of Highways v. Berwind Land Co.*, 167 W.Va. at 732, 280 S.E.2d at 614.

■ We hold, therefore, that when a condemnor had prior knowledge that its contractor was selling a condemnee's coal which had been severed from the land before the institution of lawful condemnation proceedings, the fair market value of the condemnee's coal, removed before the lawful date of take, is the price for which the coal could be sold, ready for loading, by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, without consideration of the mining, production, excavation and marketing costs.

Relying on the survey prepared by the landowners' surveyor, Donald Sult, the landowners' expert witness, testified that 25,256 tons of Redstone coal and 30,276 tons of Pittsburgh coal were removed from the take area before August 1, 1974. Witnesses testified that the market for coal was excellent on the date of take, with the price per ton ranging from $24.00 to $33.25. Although sharply conflicting testimony as to the precise value of the landowner's coal was introduced, it is clear that the coal's value was considerable.[4] One witness for the landowner testified that he alone had purchased some of the excavated coal for $1,117,580.00. *Supra*, n. 3. Another witness for the Rodas testified that he purchased nearly 24,000 tons of coal from the contractor at $24.00 to $25.50 per ton.

---

4. The Department of Highways presented their evidence chiefly through the testimony of Donald Bondurant. He concluded that the value of the appellee's coal on the date of the take was $.96 per ton and calculated that the fair market value of all the coal condemned totalled $7628.00. Conversely, the landowners introduced testimony of witnesses whose appraisal of the fair market value of the coal ranged from $1,383,300 to $1,839,789.

We do acknowledge that portions of the landowners' coal were uncovered, but not removed, on the date of take; however, the precise quantity of this coal is unclear from the record. We also note that apparently neither party considered the covered coal, that is, the coal remaining in place, away from the pit, to be of any substantial value.

In any event, the jury's verdict of $890,136.00 as just compensation for the coal is certainly supported by the testimony adduced at trial. It is evident from the witnesses' testimony that well over one million dollars was paid to the contractor for portions of the coal excavated from the road cut area. Clearly, the purchase price paid for the coal by the landowners' witnesses far exceeds the verdict ultimately returned by the jury.

Our test for the sufficiency of the evidence to support a jury verdict was recently stated in syllabus point 5 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983):

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

*See also Hardman Trucking, Inc. v. Poling Trucking Co.*, 176 W.Va. 575, 578–79, 346 S.E.2d 551, 555 (1986).

We conclude that the verdict was supported by the evidence, and therefore should not be set aside.

For the reasons stated herein, we affirm the judgment of the Circuit Court of Harrison County.

Affirmed.