## A03A1537, A03A2195. DEPARTMENT OF TRANSPORTATION v. SOUTHEAST TIMBERLANDS, INC.; and vice versa.

(589 SE2d 575)

PHIPPS, Judge.

The Georgia Department of Transportation (DOT) filed a condemnation petition in the Superior Court of Chatham County to acquire approximately 378 acres of land for $285,000. DOT wanted the land "to mitigate damages to wetlands being destroyed by the construction" of a nearby state road. The landowner, Southeast Timberlands, Inc. (Southeast), opposed the petition and demanded greater compensation. A jury awarded Southeast $886,999.

In Case No. A03A1537, DOT appeals, arguing that the trial court erred by allowing Southeast to present inadmissible evidence concerning the value of the land and by failing to direct a verdict in its favor. In Case No. A03A2195, Southeast appeals the trial court's denial of its motion to dismiss DOT's appeal for unreasonable delay in transmitting the record to this court. We consolidate these cases, consider Case No. A03A2195 first, and affirm both.

1. The undisputed facts relevant to Southeast's claim are as follows. After the trial court entered judgment for Southeast on the jury verdict, DOT filed a motion for new trial and — later the same day — Southeast filed a notice of appeal. The clerk of court billed Southeast for costs associated with transmitting the record to this court, but Southeast did not pay the bill because it believed its appeal was void.[1]

The trial court later denied DOT's motion for new trial, and DOT filed a notice of cross-appeal. Southeast moved to dismiss the cross-appeal as void, but the trial court denied that motion. At the hearing on the motion to dismiss, DOT's counsel stated that he had a check to pay the bill of appeal costs, but first wanted the clerk's office to send a new bill of costs to DOT. Counsel for Southeast did not object. The clerk's office then billed DOT directly, and DOT paid the bill approximately three weeks later.

Southeast moved to dismiss DOT's appeal for unreasonable delay in the payment of costs. After a hearing, the trial court denied the motion, finding that while there had been a delay, "it was due to the confusion surrounding the post-trial appellate procedure" and was "neither unreasonable nor inexcusable." Southeast appeals that ruling.

Under OCGA § 5-6-48 (c), the trial court may dismiss an appeal, after notice and an opportunity for a hearing, if there has been a delay in the transmission of the record to the appellate court and

---

[1] See *Griffin v. Loper*, 209 Ga. App. 504 (433 SE2d 653) (1993); *Smith v. Smith*, 128 Ga. App. 29, 30 (2) (195 SE2d 269) (1973).

that delay was unreasonable, inexcusable, and caused by the appealing party.[2] Although a delay of more than 30 days is presumptively unreasonable and inexcusable, the appealing party may rebut the presumption by presenting evidence at a hearing on the issue.[3] The trial court has broad discretion to determine whether to dismiss an appeal due to a delay in paying costs, and we will not disturb the court's decision absent an abuse of discretion.[4]

Guided by the principle that we should avoid dismissing appeals and reach the merits whenever possible,[5] we find no abuse of discretion here. The evidence in the record supports the court's conclusion that the delay in payment of costs was due to confusion about the status of the parties' appeals. That confusion began when Southeast filed a notice of appeal shortly after DOT filed a motion for new trial and continued when DOT filed a subsequent notice of cross-appeal. Because the appellant, not the appellee, is responsible for payment of costs,[6] the clerk's office initially billed Southeast, not DOT. Moreover, the record indicates that DOT's counsel was uncertain whether the amount of the initial bill was correct, that counsel declared in open court his intention to ask the clerk to bill DOT directly, and that Southeast's counsel did not object to this delay. Once DOT was billed directly, it paid the bill within 30 days. Thus, the evidence authorized the trial court to find that the delay was reasonable, excusable, and not DOT's fault. In addition, we note that Southeast presented no evidence that it was prejudiced by the delay.[7]

Southeast relies on *Leonard v. Ognio*,[8] in which we reversed a trial court's denial of a motion to dismiss an appeal for late payment of costs. But unlike this case, *Leonard* involved no confusion over which party was supposed to pay the costs, whether an appeal was valid, and whether the amount billed by the clerk of court was correct. Thus, *Leonard* is not controlling.

2. We now turn to the merits of DOT's appeal.

(a) DOT contends that the trial court erred in admitting the testimony of Southeast's expert witness, environmental consultant

---

[2] See *McCorvey Dev. v. D. G. Jenkins Dev. Corp.*, 260 Ga. App. 276, 277 (581 SE2d 308) (2003).

[3] Id.

[4] Id.; *Cody v. Coldwell Banker Real Estate Corp.*, 253 Ga. App. 752, 753 (560 SE2d 275) (2002); *Unifund General v. Orr*, 191 Ga. App. 836, 837 (383 SE2d 199) (1989).

[5] See *Gilland v. Leathers*, 141 Ga. App. 680-681 (234 SE2d 338) (1977).

[6] See *Long v. City of Midway*, 251 Ga. 364 (306 SE2d 639) (1983).

[7] See *Jim Walter Homes v. Strickland*, 185 Ga. App. 306, 307-308 (363 SE2d 834) (1987) (trial court was authorized to deny motion to dismiss appeal for late payment of costs where, among other things, appellees neither alleged nor showed that prejudice would result from allowing appeal).

[8] 201 Ga. App. 260 (410 SE2d 814) (1991).

Thomas Ballou, regarding the taken land's potential use as a wetlands mitigation bank.

At trial, Southeast's president, Jewett W. Tucker, Jr., testified that in the 1980s he had assembled six contiguous parcels of mostly unimproved land near Savannah totaling more than 10,000 acres. The property had once been known as Vallambrosa Plantation, and rice had been cultivated there. The 378 acres acquired by DOT were located near the center of the tract and were mostly controlled marshland, but also included some swampland and an easement for ingress and egress over approximately 11 acres of wooded uplands.

Southeast claimed that the highest and best use of the land was as a wetlands mitigation bank. Ballou testified that the Army Corps of Engineers requires permits to be obtained before construction in certain areas designated as wetlands. If the construction will damage the wetlands, then the builder must mitigate that damage by creating new wetlands elsewhere or by restoring, enhancing, or preserving existing wetlands. "On-site" mitigation occurs when a builder uses part of his own property near the proposed construction to mitigate wetlands damage. "Off-site" mitigation, on the other hand, "is located someplace other than the property where the permit allows you to fill the wetlands." Ballou explained that wetlands mitigation banks are areas where large amounts of wetlands can be restored relatively cheaply, thereby generating a reserve of "mitigation credits" that can be sold to builders needing wetlands permits for other projects.

Ballou testified that the taken land "was a natural wetland area that had been highly modified, but . . . could be very easily restored." Thus, he opined that the land was "very, very well suited, almost uniquely suited" for development as a wetlands mitigation bank. Ballou estimated that it would cost up to $350,000 to develop the land into a mitigation bank, and that the bank could generate between 1,286 and 1,701 mitigation credits.

DOT repeatedly objected that Ballou's testimony was speculative and irrelevant because the land had not been developed into a wetlands mitigation bank on the date of the taking. DOT also moved to strike Ballou's testimony. The trial court overruled the objections and denied the motion to strike.

The measure of damages in a condemnation case is

first, the market value of the property actually taken; second, the consequential damage that will naturally and proximately arise to the remainder of the owner's property from

the taking of the part which is taken and the devoting of it to the purposes for which it is condemned.[9]

"It has long been the policy of the Georgia appellate courts to be liberal in allowing matters to be considered by the jury which might affect their collective mind[s] in determining the just and adequate compensation to be paid the condemnee."[10] Thus, in calculating the market value of the property, the jury "should be allowed to inquire as to all legitimate purposes, capabilities and uses to which the property might be adapted, provided that such use is reasonable and probable and not remote or speculative."[11] The trial court has discretion to admit or exclude evidence of a proposed use for the land, and we will not disturb the court's decision absent a manifest abuse of that discretion.[12]

DOT argues that Ballou's testimony should not have been admitted because Tucker testified that he had planned to develop Vallambrosa Plantation into a "high-end golf course community" with a marina, not a wetlands mitigation bank. But Tucker also testified that he "had always planned on utilizing the [taken] property" as on-site mitigation for the golf course community. Indeed, DOT planned to use the land for wetlands mitigation and obtained a permit for that purpose before the taking. Thus, the trial court did not abuse its discretion in admitting Ballou's testimony that the land's highest and best use was for wetlands mitigation.

DOT also contends that Ballou "was erroneously permitted to presume that the development of the subject property as a wetland mitigation bank was an accomplished fact," although there was no evidence that Southeast had tried to develop the land for that purpose before the taking. DOT relies on our decisions in *Colonial Pipeline Co. v. Williams*[13] and *Dept. of Transp. v. Benton*,[14] in which we held:

> The fact that the property is merely adaptable to a different use is not in itself a sufficient showing in law to consider such different use as a basis for compensation. It must be

---

[9] (Citation and punctuation omitted.) *Ideal Leasing Svcs. v. Whitfield County*, 254 Ga. App. 397, 399 (562 SE2d 790) (2002).

[10] (Citation and punctuation omitted.) *Dept. of Transp. v. Brooks*, 153 Ga. App. 386, 389 (2) (265 SE2d 610) (1980).

[11] (Citation and punctuation omitted.) *Dept. of Transp. v. Kanavage*, 183 Ga. App. 143 (358 SE2d 464) (1987); see also *Dept. of Transp. v. Pilgrim*, 175 Ga. App. 576, 578 (2) (333 SE2d 866) (1985).

[12] *Hall County v. Merritt*, 233 Ga. App. 526, 527-528 (1) (504 SE2d 754) (1998); *Pilgrim*, supra.

[13] 206 Ga. App. 303 (425 SE2d 380) (1992).

[14] 214 Ga. App. 221 (447 SE2d 159) (1994).

shown that such use of the property is so reasonably probable as to have an effect on the *present value* of the land. Even where a different use is probable, the jury cannot evaluate the property as though the new use were an accomplished fact; the jury can only consider the new use to the extent that it affects the market value *on the date of taking*.[15]

*Colonial Pipeline* and *Benton* do not apply here. In those cases, the taken parcels of land were unimproved, but the condemnees' expert witnesses testified that their highest and best uses were as residential subdivisions. In addition, the expert witnesses estimated what the parcels would be worth after subdivision. We held that evidence of post-taking valuation based on hypothetical future subdivisions of the parcels was not admissible because "the only question for decision is the value of property taken . . . *at the time of taking*."[16]

Ballou merely testified that the land's highest and best use was as a wetlands mitigation bank. Unlike the experts in *Colonial Pipeline* and *Benton*, he did not estimate how much income the land would generate if it operated as a wetlands mitigation bank. And the trial court excluded testimony from another of Southeast's witnesses about how much the mitigation credits would be worth. Thus, contrary to DOT's assertions, Ballou's testimony about how many mitigation credits the land could yield simply explained and reinforced his determination of the land's highest and best use; it was not a post-taking valuation of the land. Moreover, Ballou did not assume that the land already had been developed into a wetlands mitigation bank. To the contrary, he testified that the land would need to be restored to its original wetlands state, and he explained the costs associated with restoration and maintenance.[17]

(b) DOT also complains that the trial court should not have allowed Tucker to give his opinion of the consequential damages to the remainder of Southeast's property resulting from DOT's acquisition of the 378 acres. Tucker testified that the taking reduced the value of the remaining land by $2.5 million. He explained that the taken property lay where he had envisioned a marina for a future residential community, and that without the marina, lots would be less valuable and "[i]t would take longer" for Tucker to sell the prop-

---

[15] (Citations and punctuation omitted; emphasis in original.) *Colonial Pipeline*, supra at 304; see also *Benton*, supra at 222.

[16] (Citation omitted; emphasis in original.) *Benton*, supra at 222 (1).

[17] See *Unified Govt. of Athens-Clarke County v. Watson*, 255 Ga. App. 1, 5 (3) (564 SE2d 453) (2002) (*Colonial Pipeline* case did not apply where testimony of condemnee's valuation expert showed that he did not assume property had already been rezoned to permit highest and best use).

erty to another developer to construct the community. DOT objected to this testimony, but the trial court overruled the objection.

As in Division 2 (a), DOT argues that Tucker's testimony ran afoul of the guidelines set forth in *Colonial Pipeline*[18] and *Benton*[19] because Tucker assumed that development of the land into a residential community was an accomplished fact even though no development had yet occurred. Tucker's testimony shows otherwise. He explained that he never intended to develop the property himself, but planned to sell it to a third party for eventual development. He calculated the property's value as the site of a *potential* residential community on a per acre basis, not on the basis of sales of hypothetically subdivided lots. His consequential damages figure was based on his estimation of a reduction in the amount he could get from another developer *before* development, not from hypothetical future subdivision residents *after* development. The trial court did not abuse its discretion in allowing Tucker's testimony.

3. Next, DOT contends that the trial court erred by allowing Tucker to testify about his opinion of the taken property's value. Tucker testified that he thought the property was worth $1.5 million if used for on-site wetlands mitigation. DOT objected on the ground that there was no evidence that Tucker had experience in wetlands mitigation. The trial court overruled the objection.

A property owner may offer his opinion of the value of his property, provided that he shows he has had an opportunity to form a correct opinion.[20] "The question of whether a witness has established sufficient opportunity for forming a correct opinion or has stated a proper basis for expressing an opinion is for the trial court."[21] We review the court's decision for abuse of discretion.[22]

There was no abuse here. Tucker testified that he had been a real estate developer for more than 30 years and had sold more than 300,000 acres of land, involving millions of dollars. He also testified that during his 20-year involvement with Vallambrosa Plantation, he had become very familiar with its topography and hydrology. The trial court was entitled to conclude that Tucker's extensive experience with real estate generally and with the taken property gave him an opportunity to form a correct opinion about its value. The absence

---

[18] Supra.

[19] Supra.

[20] *Iffland v. Lancaster*, 176 Ga. App. 449, 450 (3) (336 SE2d 350) (1985); see generally OCGA § 24-9-66.

[21] (Citations omitted.) *Dept. of Transp. v. McLaughlin*, 163 Ga. App. 1, 5 (3) (292 SE2d 435) (1982), overruled on other grounds, *White v. Fulton County*, 264 Ga. 393, 394 (1) (444 SE2d 734) (1994).

[22] See id.

of evidence showing Tucker's specific expertise in wetlands mitigation does not alter this conclusion.

4. DOT argues that the trial court erred in allowing Tucker to testify about his opinion of the value of the taken property, assuming its highest and best use was a wetlands mitigation bank, and also to testify about consequential damages to the remainder of the property based on a highest and best use of the entire tract as an upscale residential community with a marina. According to DOT, it would be impossible to simultaneously use the taken land as a wetlands mitigation bank and the remainder as a high-end residential community with a marina. Thus, DOT asserts that Tucker's testimony violated the "consistent use" principle and invited the jury to award Southeast more than the fair market value of the taken property.[23]

Even if Tucker's testimony involved inconsistent valuations of the land, any error associated with admitting it was harmless. Tucker testified that the taken property was worth $1.5 million as a wetlands mitigation bank and that the taking caused $2.5 million in consequential damages to the remainder if it was used as a high-end residential community. The jury, however, awarded Southeast $886,999 — an amount less than either figure offered by Tucker. Because the award fell below Tucker's calculation of either consequential or direct damages and therefore was not obviously based on a combination of incompatible valuations,[24] we find no reversible error.

5. Finally, DOT asserts that it was entitled to a directed verdict because Southeast's evidence of the value of the property was speculative and without probative value. Because this claim of error is simply a restatement of the arguments we rejected in Divisions 2 through 4, it lacks merit.

*Judgments affirmed in Case Nos. A03A1537 and A03A2195. Blackburn, P. J., and Ellington, J., concur.*

DECIDED OCTOBER 9, 2003 —
RECONSIDERATION DENIED OCTOBER 28, 2003 — 

*Thurbert E. Baker, Attorney General, Smith & Jenkins, Wilson R. Smith, Anne W. Sapp*, for appellant.

---

[23] See *Ideal Leasing*, supra at 401 (evidence presented in condemnation case cannot "require the jury to reach the verdict by combining incompatible testimony within the same class of damages").

[24] Compare *State Hwy. Dept. v. Smith*, 120 Ga. App. 529, 532 (4) (171 SE2d 575) (1969) (reversal required where two witnesses used incompatible methods of valuing the taken property *and* jury obviously added the values given by the witnesses in determining award).

*Chamberlain, Hrdlicka, White, Williams & Martin, James L. Paul, Matthew J. McCoyd*, for appellee.