**FILED**

**November 14, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16 -1163 - *W.Va. Dep't of Transp., Div. of Highways v. CDS Family Trust, LLC*

LOUGHRY, Chief Justice, concurring:

While I agree with the majority's decision that a new trial was required in this matter due to the improperly and heavily-weighted reliance on the market price of potential mitigation credits, I find it necessary to write separately to address my additional concern that trial courts need to properly marshal evidence that is adduced for purposes of valuing wetlands. Other than quoting from the decision in *Department of Transportation v. Southeast Timberlands, Inc.*, 589 S.E.2d 575 (Ga. Ct. App. 2004), the majority offers very little advice to the trial court for its handling of this case on remand. Accordingly, I wish to address certain issues that the trial court may need to consider when quandaries arise with regard to the admission of expert testimony on the valuation of the subject land.

First and foremost, the trial court needs to recognize that, as the majority acknowledged, there is no consensus on how to value land when its highest and best use is the potential to be utilized as a wetlands mitigation bank. *See* David M. Keating*, MAI*, *The Valuation of Wetlands* 37 (2d ed. 2002) ("The total economic value of wetlands is a relatively new concept, and scientists are working to formulate methods for estimating such values."). And, as the Division of Highways aptly observes in its reply brief, decisions with regard to environmental protection laws are affected by the political climate as demonstrated by the multitude of directives instituted by President Trump since taking office this past

1

January. Included in those policy changes was Executive Order 13,778, "Restoring the Rule of Law, Federalism, and Economic Growth by reviewing the 'Waters of the United States Rule.'" That order, signed on February 3, 2017, has potential impact on the value of wetlands, and wetlands credits, as it mandates the withdrawal and reconsideration of the Clean Water Rule, 80 Fed. Reg. 37054 (June 29, 2015).[1] Consequently, the regulations and guidelines previously utilized under the Obama administration are now in a state of flux due to the vagaries of the regulatory process itself[2] and numerous lawsuits instituted to halt such changes.[3] Given that the wetlands banking mitigation industry is unquestionably dependent on the current political climate, the valuation testimony provided below has clearly been called into doubt.

A secondary caution only hinted at by the majority is a need to ensure that the valuation is limited to adaptable uses that are "*reasonable and probable and not remote or speculative*." *Southeast Timberlands*, 589 S.E.2d at 579 (emphasis supplied). The critical valuation for purposes of condemnation is always the market value on the date of taking, and yet the expert testimony proffered by CDS was linked to the *future* application for mitigation

---

[1]Because the terms "waters of the United States" is undefined in the Clean Water Act, 33 U.S.C. §§ 1251-1387 (2012), it has been defined by regulation to include wetlands and intermittent streams.

[2]Under the subject executive order, the EPA and the Army Corp of Engineers have been directed to publish a proposed rule rescinding or revising the Clean Water Rule.

[3]*See* 40 C.F.R. § 230.93(a); 33 C.F.R. § 332.1(b)(3).

credits–something that may or may not transpire. Significantly, at no time prior to the taking had any steps been taken to construct a wetlands mitigation bank on the subject property. The experts hired by CDS testified solely in terms of the "potential" of the property to be developed for such purpose.

At least one court has ruled that the prospective application for mitigation credits has no relevance with regard to the issue of just and adequate compensation. In *Martha K. Wayt Trust v. City of Cumming*, 702 S.E.2d 915 (Ga. Ct. App. 2010), the court considered the trial court's refusal to allow an expert to testify regarding the value of stream mitigation credits for purposes of valuing the condemned property. In affirming the trial court's decision, the appellate court reasoned:

> The evidence showed that, at the time of the taking, the proposed stream mitigation bank had not yet been created on the condemned property, and no stream mitigation credits had been awarded in connection with the condemned property. And no evidence was presented to show that the proposed future use of the property as a stream mitigation bank, or the value of stream mitigation credits it might have generated under such use, had an effect on its market value *on the date of the taking*.

*Id.* at 918. Citing *Southeast Timberlands*, the court reasoned further:

> The fact that the property is merely adaptable to a different use is not in itself a sufficient showing in law to consider such different use as a basis for compensation. It must be shown that such use of the property is so reasonably probable as to have an effect on the *present value* of the land. Even where a different use is probable, the jury cannot evaluate the property as though the new use were an accomplished fact; the jury can only

3

consider the new use to the extent that it affects the market value *on the date of taking*.

*Id.* (quoting *Southeast Timberlands*, 589 S.E.2d at 580).

Of further concern is the fact that the experts hired by CDS to inflate the value of this property appear somewhat incestuous, relying on each other's data rather than having the necessary expertise to testify independently.[4]  This should be a warning sign to the trial court, when it conducts its gatekeeping function to determine whether such individuals have the appropriate expertise to testify on the valuation-related issues.  Robert Sokolove, one of the three experts relied on by CDS was a Delaware lawyer, whose professional credentials reflect zero experience in real estate valuation or appraisal.  Mr. Sokolove, a self-described "wetland mitigation banker," testified that the subject land "had a significant opportunity to be utilized as a mitigation bank."  What is notable is that his report contained no opinions concerning the fair market value of the entire property before taking, the fair market value of the property taken, or the value of the residue of the property after the taking.  Worse yet, is that he failed to rely upon any of the recognized methods of valuing real estate.[5]  Looking solely to his business experience in "get[ting] your values" from the sale of wetlands credits,

---

[4]Douglas C. Wise, an expert hired by CDS to estimate the total just compensation due for the taking and damages to the residue, stated in his report that he merely adopted the opinions and conclusions of CDS' other experts–Mr. Sokolove and RK&K.  In reaching his conclusion, Mr. Sokolove relied upon the findings of RK&K and Mr. Reel.

[5]Those methods include the sales comparison approach, the cost approach, and the income capitalization approach.

4

Mr. Sokolove prognosticated that a willing buyer would pay $3,551,000 for the property at issue because he could then resell the mitigation credits for over $5 million later.

The record in this matter similarly calls into question the expert testimony provided by Mr. Wise, another expert hired by CDS.[6] While he supplied a figure of $5,670,000 as the fair market value of the property before the taking, he failed to employ any acceptable approach for arriving at such figure.[7] It cannot be overlooked that the singular basis for that figure was his reliance on alleged sales of wetlands mitigation credits provided to him by Mr. Sokolove. So rather than looking to any comparable sales or any other accepted appraisal theory, Mr. Wise simply subscribed hook, line, and sinker to the valuation that Mr. Sokolove provided to him–the lawyer's guestimate that 349.22 acres would have sold for $65,000 per credit acre and $2,042.21 per stream credit *if* the property had been developed into a wetlands mitigation bank. Not only is this credit-based method of valuation constructed upon speculation and illusion, but its foundational flaws are glaringly apparent.

The appraisal of wetlands has been recognized as controversial due to the differing conclusions that result from each distinct method of valuation. *See* Keating, *supra*,

[6]*See supra* note 4.

[7]*See supra* note 5.

at 41. Despite this acknowledgment, in this case the entire valuation was conjured from the pen of a lawyer who admitted to making his living as a "wetland mitigation banker." This type of self-serving evidentiary foundation is wholly suspect and should not be permitted to suffice on remand. And, as this Court long ago recognized:

> Speculation as to what use may be made of property at some future indefinite date is insufficient. . . . Possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to have no perceptible effect upon present market value must be excluded from consideration.

*State Road Comm'n v. Penndel Co.*, 147 W.Va. 505, 511-12, 129 S.E.2d 133, 137 (1963).

With this additional guidance, I respectfully concur.