FILED

**November 14, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-1163 – *West Virginia Department of Transportation, Division of Highways, a public corporation v. CDS Family Trust, LLC, a Delaware limited liability company*

Justice Ketchum, concurring:

The trial judge did a yeoman's job handling this novel and complex condemnation case.[1] Despite the trial judge's Herculean efforts, I believe that the opinions of the landowner's experts were speculative and misleading. The trial judge should have found that their testimony was inadmissible.

The trial in this case devolved into a debate about the value of "wetlands mitigation credits." It should have been about the fair market value of the condemned land, that is, what an informed, willing buyer would pay an informed, willing seller for land on the open market. I write separately to emphasize that when, in a condemnation action, an expert's opinion of fair market value deviates into a speculative, misleading or confusing mess, the RULES OF EVIDENCE arm the trial judge with the power to exclude that valuation.

At trial, the evidence showed the Division of Highways built a new highway, Corridor H, in the mountains through various streams, valleys, and headwaters.

---

[1] The trial judge's efforts are more remarkable when you consider there seem to be only two reported appellate cases in the United States dealing directly with the introduction of wetlands mitigation credits in a condemnation case. *See Dep't of Transp. v. Southeast Timberlands, Inc.*, 263 Ga.App. 805, 589 S.E.2d 575 (2003) (admission of evidence of valuation of wetlands mitigation credits, if error, was harmless); *Martha K. Wayt Tr. v. City of Cumming*, 306 Ga.App. 790, 702 S.E.2d 915 (2010) (evidence as to the value of stream mitigation credits was irrelevant and inadmissible).

1

The DOH was required, somehow, to either remediate the damage the construction caused to the environment or mitigate the damage by coming up with suitable replacement wetlands.

The DOH's solution was to condemn 123.51 acres of creek-bottom land owned by the CDS Family Trust. The DOH wanted to use the land as permanently preserved "wetlands" to replace the acres of wetlands filled or damaged by its highway construction.

CDS offered evidence that the highest and best use of the land[2] was as a "wetlands mitigation bank" filled with "mitigation credits." Making a mitigation bank is

_____

[2] Just compensation is not necessarily based upon the land's current use, but rather is based upon the property's reasonable use in the near future that will result in its highest value. West Virginia's recently-published pattern jury instructions suggests the following definition for "highest and best use of property":

> A landowner is entitled to have [*his/her/their/its*] property valued on its highest and best use. "Highest and best use" means the use for which the property may be reasonably used that will result in its highest value.
>
> You should consider any uses which might reasonably have been made of the property in light of the conditions and circumstances existing when the property was taken on [*date condemnation application filed*]. You should consider all of the natural advantages and disadvantages of the property, as well as the characteristics and needs of the surrounding community which existed at the time of the taking or which would exist in the immediate future.
>
> The uses to which the property is adaptable must be so reasonably probable as to have an effect on its fair market value. You may not consider imaginative or speculative uses of the property or merely speculative plans of the landowner.

2

a complicated, often expensive process involving engineers and environmental professionals, and which requires permits and intense scrutiny by the U.S. Army Corps of Engineers and other federal agencies.[3]

> A mitigation bank is a form of sell-out property resembling a residential subdivision. Instead of lots, however, a mitigation banker sells credits – usually acreage-based credits. The banker obtains these credits from applicable jurisdictional agencies for creating, enhancing, or restoring wetland functions in an area. The banker then sells these credits on the open market for the highest possible price in order to maximize revenues. The supply of credits awarded a bank is fixed, and once the credits are sold the property has no other means of generating income.

Davis Michael Keating, *The Valuation of Wetlands*, 62 (2nd Ed. 2002).

Wetlands mitigation banking is a novel concept that may give economic value to what otherwise might be unusable wetlands. Federal law recognizes that wetlands are critical to the environment, absorbing and filtering pollutants, reducing flooding, and providing a home for flora and fauna. When wetlands are dredged or filled, federal law requires a developer to either repair or somehow compensate for that damage. Federal regulations adopted in 2008 for the "Compensatory Mitigation for Losses of Aquatic Resources" identify ways to mitigate wetlands damage. One of the ways is

---

Menis E. Ketchum, *West Virginia Pattern Jury Instructions for Civil Cases*, § 1204 (2017).

[3] More specifically, getting a permit requires navigating the regulations of an Interagency Review Team (IRT) that includes the Corps of Engineers, the U.S. Fish and Wildlife Service, the U.S. Environmental Protection Agency, and others.

through buying wetlands mitigation bank credits.  *See* 73 Fed. Reg. 19,594-01 (April 10, 2008); 33 C.F.R. § 332.3 (b) (2008).

If the landowner can obtain the right permits from the Corps of Engineers, then the landowner can try to sell wetland mitigation credits to land developers, public works agencies, the DOH, or anyone else to offset damage done elsewhere to wetlands. *See* Yancey A. McLeod, III, "The Alchemy of Federal Wetlands Mitigation: Turning Wastelands into Gold," 31 Zoning & Planning Law Rep. 1 (No. 10, Nov. 2008). Obtaining a permit from the Corps of Engineers is an arduous but uncertain proposition.

The central problem in this case was the opinions of fair market value for the 123.51-acre tract of wetlands.  Specifically, the experts for CDS lobbed million-dollar numbers at the jury, none of which had any relation to the definition of "fair market value."  The experts talked largely about the market value of the mitigation credits, not the market value for the land.  The lawyer for the DOH strenuously objected to the weird, speculative way that the CDS experts were testifying, but to no avail.

When the government takes land for a public purpose, it must pay just compensation.  Just compensation is measured by the fair market value of the property. "The fair market value of the property taken has been defined as: '[T]he price for which the land could be sold in the market by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, and unaffected by compulsion of any kind.'"  *W.Va. Dep't of Transp., Div. of Highways v. Western Pocahontas Properties, L.P.*, 236 W.Va. 50, 61-62, 777 S.E.2d 619, 630-31

4

(2015) (quoting Syllabus Point 5, *Wheeling Elec. Co. v. Gist,* 154 W.Va. 69, 173 S.E.2d 336 (1970)).[4] The federal government uses a similar definition for fair market value:

> Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal.

Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 30 (2000).

When an expert offers an opinion about the fair market value of land, that opinion must have solid grounding. The valuation has to account for those things that private parties would consider in arriving at a price for the land, while at the same time

---

[4] A pattern jury instruction defining "fair market value" is this:

> The fair market value is the price that the property would bring if it were offered for sale on the open market by someone who wanted to sell and was bought by someone who wanted to buy, both exercising prudence and intelligent judgment as to its value, and neither being under any compulsion to buy or sell.

> In determining fair market value, you may not consider that the property owner might have been unwilling to sell to [*name of agency*], or that [*name of agency*] has a need for the property, nor can you consider the use that [*name of agency*] will make of the property.

*West Virginia Pattern Jury Instructions for Civil Cases* § 1204.

excluding things those reasonable private parties would not consider. *Western Pocahontas Properties*, 236 W.Va. at 62, 777 S.E.2d at 631.

When an expert's land valuation in a condemnation action seems amiss because it lacks grounding, trial judges have at least two tools under the RULES OF EVIDENCE to reject that valuation.

First, Rule 702 permits the admission of expert testimony only when the expert's "knowledge will assist the trier of fact . . . to determine a fact in issue." In other words, if an expert's valuation testimony in a condemnation action is not helpful and will not assist the jury in calculating just compensation, then the trial judge may exclude the expert witness's testimony. "[I]f the elements considered by the witness in reaching his opinion are irrelevant, *speculative and conjectural, or otherwise incompetent*, the opinion should be excluded." *W.Va. Dep't of Highways v. Bellomy*, 169 W. Va. 791, 793, 289 S.E.2d 511, 512 (1982) (citing 5 *Nichols on Eminent Domain*, § 18.45, at 18-300 to 18-302 (3rd rev. ed. 1979)) (emphasis added).

Second, Rule 403 permits a judge to exclude relevant evidence if its probative value is outweighed by the danger of "confusing the issues" or "misleading the jury." "[T]he role of the trial court is to keep from the jury's eyes or ears evidence that may be misleading." *State v. Knuckles*, 196 W.Va. 416, 424, 473 S.E.2d 131, 139 (1996). Accordingly, where an expert's testimony is "confusing or misleading the trial judge may properly refuse to admit it." Syllabus Point 4, *Rozas v. Rozas*, 176 W.Va. 235, 342 S.E.2d 201 (1986). *See also*, *W.Va. Dep't of Transp., Div. of Highways v. Parkersburg Inn, Inc.*, 222 W.Va. 688, 700, 671 S.E.2d 693, 705 (2008) (excluding

expert testimony as confusing).  Put in the context of a condemnation action, if the probative effect of an expert's valuation opinion is outweighed by its confounding, misleading impact on the jury's assessment of the property's fair market value, the trial judge may exclude it.

In this case, the landowner's experts lobbed out disjointed valuations that were not grounded in the fair market value of the 123.51-acre tract.  For instance, Robert Sokolove, a lawyer, testified the landowner would have to spend $1.8 million on construction to *create* wetlands on the tract, and then the landowner would have to apply to the government for permits, which might then have resulted in up to $5 million in wetlands credits sales, which – put together – meant the net value of the land was $3.2 million.

My overall reading of Mr. Sokolove's opinion is blunt: the opinion is utter nonsense as a fair market price.  The value of mitigation credits generated by the land does not equal the fair market value of the land.  West Virginia (and just about every other State) uses the "unit rule" which means that the values of the various parts of land do not necessarily equal the value of the whole.  *See W.Va. Dep't of Highways v. Berwind Land Co.*, 167 W.Va. 726, 280 S.E.2d 609 (1981); *Strouds Creek and Muddlety R. R. Co. v. Herold*, 131 W.Va. 45, 45 S.E.2d 513 (1947).[5]  Mr. Sokolove's opinion violates the unit rule.  Let me explain.

---

[5] West Virginia also uses a variation on the unit rule called the "undivided fee rule," which requires "that property be valued as a whole rather than the sum of the values of the various interests into which it may have been carved, such as lessor and lessee, life tenant and remainderman, and mortgagor and mortgagee, etc." *Uniform*

Land can be seen as an aggregate of important, valuable pieces: a house, a barn, lots for a future subdivision, timber, strata of coal, oil and gas, or credits in a mitigation bank. An expert cannot value each separate component, then simply add them together as the property's fair market value for an obvious reason: no buyer in their right mind would pay that price. "[T]he value of an element can be considered in determining the fair market value of land," but it cannot be the only element, nor can the separate values of those elements merely be added together. *Berwind Land*, 167 W.Va. at 745, 280 S.E.2d at 620. "For example, the value of timber, as an independent component, cannot be added to the value of minerals in the same property as an independent component, and this sum further added to the value of the land." *Uniform Appraisal Standards for Federal Land Acquisitions* at 53-54. "The unit rule is a rule in condemnation proceedings that prohibits the separate valuation of timber, oil, and other commodities apart from the parcel that contains them. The land must be valued as a whole; thus, commodities may be considered only to the extent they enhance the property's overall value." *Dep't of Transp. ex rel. People v. Farnsworth*, 273 Ill.App.3d 631, 633, 653 N.E.2d 423, 424 (1995). Condemned property must be valued as an integrated unit; the individual components can be considered only to the extent they

*Appraisal Standards for Federal Land Acquisitions* at 53. *See generally*, Syllabus Point 1, *State by Dep't of Nat. Res. v. Cooper*, 152 W.Va. 309, 162 S.E.2d 281 (1968) ("Where the State of West Virginia, or any entity with statutory authority to take property for public use, undertakes to acquire the fee simple title to a parcel of land all persons who own an interest or an estate in such parcel must be joined as party defendants in the proceeding.")

effect that value. An appraiser cannot merely add the components together to arrive at a value.

Applying the unit rule to this case, no reasonable, prudent, informed buyer would pay $3.2 million today for land that might, perchance, someday produce $3.2 million in mitigation credit sales in the future. Mr. Sokolove never gave an opinion of the land's fair market value; instead, he offered valuation testimony as to one component separate and apart from the land. Moreover, reading the record, one is struck by the amount of speculation and effort necessary to *create* wetlands in the West Virginia Mountains, and by the fact that Mr. Sokolove's opinion presumed that the landowner would successfully convince the Corps of Engineers (and other government agencies) to approve use of the land for mitigation banking. His opinion appears to have also ignored that, once the landowner sold the mitigation credits, the landowner would have to continue to expend money and effort maintaining the land as wetlands in perpetuity, as well as paying taxes on the profits generated by selling the wetlands credits. Put simply, Mr. Sokolove's opinion centered on the value of a component of the 123.51-acre tract; he failed to suggest a fair market value for the tract as a unit.

The landowner's appraisal expert, Douglas C. Wise, gave testimony that relied upon Mr. Sokolove's opinions. Mr. Wise testified he had no expertise in mitigation banking, and then, just as quickly, gave his unsupported opinion that the remainder of the property could be used for wetlands mitigation banking. Then he said the DOH's taking of the 123.51-acre tract for use as wetlands impaired the use of the remainder for wetlands credits, a loss to the landowner of around $2 million. As far as I

9

can tell, he considered no comparable sales, nor did he use any recognized appraisal approach in valuing the property.

The United States Supreme Court once cautioned that, when an expert witness relies on factual premises that may not be supported by any admissible evidence, a trial judge should instruct the jury "that an expert's opinion is only as good as the independent evidence that establishes its underlying premises." *Williams v. Illinois*, 567 U.S. 50, 81, 132 S. Ct. 2221, 2241, 183 L. Ed. 2d 89 (2012). In my treatise on pattern jury instructions, I suggested judges give the following instruction:

> [*Name of witness*], an expert witness, relied on out-of-court material in forming [*his/her*] opinion. [*Name of witness*] may not have had personal first-hand knowledge of this out-of-court material. An expert's opinion is only as good as the out-of-court material upon which [*he/she*] relies in forming [*his/her*] opinion. You may consider whether the out-of-court material relied upon by [*name of witness*] is accurate and reliable and compare it to other evidence. It is up to you to determine the value of an expert witness's testimony. You can believe, or not believe, all or any part of an expert witness's testimony.

*West Virginia Pattern Jury Instructions for Civil Cases*, § 1308.

On remand, the trial judge may want to assure that the expert opinions offered by CDS are something more than a random assortment of million-dollar figures. Under the RULES OF EVIDENCE, the testimony cannot be speculative, confusing and misleading. More importantly, the expert testimony must actually be dedicated to the central purpose of a condemnation action: allowing the jury to determine a fair market value for the property taken and any damages to the remainder.

10