# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2017 Term

**FILED**
**November 14, 2017**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-1163

**WEST VIRGINIA DEPARTMENT OF TRANSPORTATION,
DIVISION OF HIGHWAYS,
A PUBLIC CORPORATION,
Petitioner Below, Petitioner**

**V.**

**CDS FAMILY TRUST, LLC,
A DELAWARE LIMITED LIABILITY COMPANY,
Respondent Below, Respondent**

---

**Appeal from the Circuit Court of Tucker County
Honorable Lynn A. Nelson, Judge
Civil Action No. 11-C-50
REVERSED AND REMANDED**

---

Submitted:  October 31, 2017
Filed:  November 14, 2017

Leah R. Chappell                    Christopher B. Power
Adams, Fisher & Chappell, PLLC       Mychal S. Schulz
Ripley, West Virginia                Babst, Calland, Clements and Zomnir, P.C.
Attorney for the Petitioner          Charleston, West Virginia
                                     Attorneys for the Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**CHIEF JUSTICE LOUGHRY** concurs and reserves the right to file a concurring opinion.

**JUSTICE KETCHUM** concurs and reserves the right to file a concurring opinion.

**SYLLABUS BY THE COURT**

1.     When valuing wetland property for the purpose of just compensation in a condemnation proceeding, the highest and best use of the property as a mitigation bank may be considered to the extent that such a factor would be weighed in negotiations between private persons participating in a voluntary sale and purchase of the land at the time it was taken. However, the market price of mitigation credits that ultimately may be produced from the property cannot be the sole basis for measuring the land's value in determining just compensation.

**Davis, Justice:**

In this appeal, we are asked to rule upon the admissibility of expert testimony valuing wetland property for the purpose of just compensation in a condemnation proceeding where the highest and best use of the wetlands was determined to be the development of a wetlands mitigation bank. We conclude that, because the expert testimony at issue provided a value that was improperly based upon the market price of mitigation credits that could be developed from the land, as opposed to the fair market value of the land itself in a voluntary transaction between a willing and knowledgeable buyer and seller, the testimony was inadmissible. Accordingly, we reverse this case and remand for a new trial consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Respondents in this appeal, the CDS Family Trust, LLC ("CDS"), owned the surface interests of approximately 772 acres of land in Tucker County West Virginia. On November 30, 2011, the West Virginia Department of Transportation, Division of Highways ("DOH"), filed in the Circuit Court of Tucker County a petition seeking condemnation of 123.51 acres of the surface tract owned by CDS ("the Take Property"). DOH sought the land to use it for permittee-managed environmental mitigation incident to DOH's construction of

1

Appalachian Corridor H.[1]  In addition, DOH requested a jury trial to determine the amount

of just compensation due the owner of the condemned acreage.


Accordingly, wetlands mitigation is at the core of this case.  With respect to

wetlands mitigation, it has been explained that

> the Army Corps of Engineers requires permits to be obtained
> before construction in certain areas designated as wetlands.  If
> the construction will damage the wetlands, then the builder must
> mitigate that damage by creating new wetlands elsewhere or by
> restoring, enhancing, or preserving existing wetlands. "On-site"
> mitigation occurs when a builder uses part of his own property
> near the proposed construction to mitigate wetlands damage.
> "Off-site" mitigation, on the other hand, "is located someplace
> other than the property where the permit allows you to fill the
> wetlands." . . .  [W]etlands mitigation banks are areas where
> large amounts of wetlands can be restored relatively cheaply,
> thereby generating a reserve of "mitigation credits" that can be
> sold to builders needing wetlands permits for other projects.

*Department of Transp. v. Southeast Timberlands, Inc.*, 263 Ga. App. 805, 807, 589 S.E.2d

575, 579 (2003).[2]  As noted above, DOH condemned the Take Property to use it for its own

wetlands mitigation.  CDS similarly determined, through its experts, that the highest and best

---

[1]In other words, no portion of Corridor H would be constructed on this property.  Instead, the property was to be used to mitigate, or replace, wetlands located elsewhere that were damaged or destroyed by the construction of Corridor H.  The concept of wetlands mitigation is described *infra*.

[2]The permit mentioned in this quotation refers to permits issued pursuant to the federal Clean Water Act.  *See* 33 U.S.C. § 1251 *et seq*.  The permits, which appear to be commonly referred to as Section 404 permits, are issued pursuant to 33 U.S.C. § 1344 (1987) (2012 ed.).

use of the land was as a wetlands mitigation bank;[3] therefore, CDS sought to have it valued

primarily as such.[4]

By order entered March 20, 2012, the circuit court received a preliminary

deposit from DOH equal to DOH's estimate of just compensation owed to CDS, which was

---

[3]One court has explained that

[f]ederal guidelines define wetlands mitigation banking as:

> [W]etland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial. It typically involves the consolidation of small, fragmented wetland mitigation projects into one large contiguous site. Units of restored, created, enhanced or preserved wetlands are expressed as "credits" which may subsequently be withdrawn to offset "debits" incurred at a project development site.

Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 Fed. Reg. 58,605-02, 58,606 (Nov. 28, 1995).

*South Carolina Coastal Conservation League v. United States Army Corps of Eng'rs*, 789 F.3d 475, 478 n.2 (4th Cir. 2015).

[4]CDS expert Douglas Wise determined that the highest and best use of a portion of the CDS property that is not wetlands would be recreational use.

3

$149,800. By that same order, the circuit court vested defeasible title to the property to DOH. Thus, March 20, 2012, was treated as the "date of take."

Prior to trial, CDS disclosed reports from three expert witnesses who would testify in support of its contention that just compensation for the condemned real property and damage to the remainder of the CDS property amounted to $4,775,000. DOH, on the other hand, retained an expert who opined that just compensation for the Take Property was $285,000, with no damage to the residue. According to the DOH expert, the highest and best use of the Take Property was for natural resource development (*i.e.*, mining)[5] and recreation (*i.e.*, hunting and fishing).

DOH filed a motion *in limine* to exclude the testimony of CDS's expert witnesses, arguing that the reports submitted by the experts failed to conform to any recognized methods or techniques necessary to produce a credible appraisal report. CDS filed a response, and, following a pretrial conference, the court entered its pretrial order on June 21, 2016, that, *inter alia*, summarily denied DOH's motion.

---

[5]As noted above, CDS owned only surface rights. Mineral rights to the Take Property were owned by WPP, L.P. DOH has compensated WPP for coal related to the taking, and WPP is not a party to this appeal.

A three-day jury trial to determine just compensation was held from June 21-23, 2016. The jury heard the evidence presented and rendered its verdict awarding CDS $1,963,972 as just compensation for the Take Property and $1,495,000 as just compensation for damages to the residue property. Thus, the jury's total award was $3,458,972. The circuit court deducted the amount DOH previously had deposited with the court and entered judgment in the amount of $3,309,172.

DOH filed a motion for a new trial, which the circuit court denied by order entered November 15, 2016. This appeal followed.

## II.

## STANDARD OF REVIEW

A circuit court's ruling denying a party's motion for a new trial is reviewed under the following standard:

> Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976). Accordingly,

> [t]his Court reviews the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we

5

> review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 1, *Burke-Parsons-Bowlby Corp. v. Rice*, 230 W. Va. 105, 736 S.E.2d 338 (2012). To the extent that DOH herein appeals evidentiary rulings made by the circuit court, we additionally are mindful that "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994). *See also* Syl. pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998) ("A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."). In view of the foregoing standards, we will address the dispositive issues raised in this appeal. We will add additional standards for our review where relevant.

## III.

## DISCUSSION

DOH raises several errors asserting that the circuit court erred by admitting the testimony of CDS expert witnesses Douglas Wise, Robert Sokolove, and Justin Reel, pertaining to the value of the Take Property.[6] At the heart of the issues raised by DOH is the

---

[6]Specifically, DOH contends that the testimony of the CDS expert witnesses
(continued...)

6

method used by the CDS experts to value the Take Property. Because we find error in the manner in which the Take Property was valued by the CDS experts, we reverse and remand this case for a new trial. Thus, our resolution of this matter does not necessitate a thorough discussion of each of the issues expressly raised by DOH.[7] Instead, we address only the admissibility of the expert testimony related to the highest and best use of the Take Property and its fair market value.

## A. *Highest and Best Use*

This Court has recognized that "[t]he measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is the fair market value of the property at the time of the taking." Syl. pt. 1, *West Virginia Dep't of Transp., Div. of Highways v. Western Pocahontas Props., L.P.*, 236 W. Va. 50, 777 S.E.2d 619 (2015), *cert. denied sub nom. Beacon Res., Inc. v. W. Virginia Dep't of Transp., Div. of Highways*, ___ U.S. ___, 136 S. Ct. 1453, 194 L. Ed. 2d 551 (2016). However,

_____

[6](...continued)
should have been found inadmissible under Rules 702 and 703 of the West Virginia Rules of Evidence, that the CDS experts improperly based their opinions on a frustration of business plans, and that the experts erroneously included business profit in their opinions of value.

[7]DOH raises an additional error asserting a late-disclosed expert rebuttal witness. Because we reverse this case and remand for a new trial, it is unnecessary for us to address this issue.

7

[a]n important consideration in estimating fair market value is determining the "highest and best use" of the property. In determining a fair value, the landowner "is not limited to the use actually being made of the land at the time of the taking but is entitled to consideration of its value for any purpose for which it is then reasonably available in the immediate future."

*Gomez v. Kanawha Cty. Comm'n*, 237 W. Va. 451, 462-63, 787 S.E.2d 904, 915-16 (2016) (quoting *Department of Highways v. Berwind Land Co.*, 167 W. Va. 726, 733, 280 S.E.2d 609, 614 (1981) (footnotes omitted)). *See also Wood v. Wyoming Cty. Court*, 100 W. Va. 29, 31, 129 S.E. 747, 747 (1925) ("The land owner . . . is entitled to compensation for the land taken based on the most valuable use to which the property is adapted."); Syl. pt. 9, *Baltimore & Ohio R.R. Co. v. Bonafield's Heirs*, 79 W. Va. 287, 90 S.E. 868 (1916) ("In proving its value the land-owners are not limited to the use which they are then actually making of the land taken, but are entitled to have the jury consider its value for any purpose for which it is then reasonably available."); Syl. pt. 3, *Norfolk & W. Ry. Co. v. Davis*, 58 W. Va. 620, 52 S.E. 724 (1906) ("As to the value of the property taken, the proper inquiry is, what is the value of the property for the most advantageous uses to which it may be applied?"); Menis E. Ketchum, *West Virginia Pattern Jury Instructions for Civil Cases*, § 1204 (2016).

In a case very similar to the case *sub judice*, the Court of Appeals of Georgia addressed this very issue. *See Dep't of Transp. v. Southeast Timberlands, Inc.*, 263 Ga. App. 805, 589 S.E.2d 575. In *Southeast Timberlands*, the Georgia Department of Transportation

8

("Georgia DOT") condemned certain land it desired to use "to mitigate damages to wetlands being destroyed by the construction of a nearby state road." *Id.* at 805, 589 S.E.2d at 577. Georgia DOT argued that expert testimony that the highest and best use of the subject land was development into a wetlands mitigation bank should not have been admitted in light of the former landowner's testimony that he had planned to develop the area into a high-end golf course community and marina, not a wetlands mitigation bank. *Id.* at 806-08, 589 S.E.2d at 579-80. Based, in part, upon the fact that Georgia DOT, itself, planned to use the land for wetlands mitigation, the *Southeast Timberlands* court rejected the argument and concluded that "the trial court did not abuse its discretion in admitting [the expert's] testimony that the land's highest and best use was for wetlands mitigation." *Id.* at 806-08, 589 S.E.2d at 579-80.[8] It reaching its conclusion, the *Southeast Timberlands* court reasoned that

> the jury should be allowed to inquire as to all legitimate purposes, capabilities and uses to which the property might be adapted, provided that such use is reasonable and probable and not remote or speculative. The trial court has discretion to admit or exclude evidence of a proposed use for the land, and we will not disturb the court's decision absent a manifest abuse of that discretion.

*Id.* at 808, 589 S.E.2d at 579 (internal quotations and footnotes omitted).

---

[8]The court also noted the former landowner's testimony that he "'had always planned on utilizing the [taken] property' as on-site mitigation for the golf course community." *Department of Transp. v. Southeast Timberlands, Inc.*, 263 Ga. App. 805, 808, 589 S.E.2d 575, 580 (2003).

We find this reasoning to be in line with this Court's precedent discussed above. Indeed, "'[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syllabus Point 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991)." Syl. pt. 4, *Western Pocahontas,* 236 W. Va. 50, 777 S.E.2d 619. Thus, under the particular facts of this case, we find the circuit court did not abuse its discretion in allowing CDS to present expert testimony that the highest and best use of the Take Property was development into a mitigation bank.[9]

### B.  Fair Market Value

Having determined the propriety of expert testimony that the highest and best use of the Take Property was development into a mitigation bank, we now consider testimony related to the value of that land.

Over the DOH's objections, CDS was permitted by the circuit court to present expert testimony as to the value of the Take Property by Robert Sokolove ("Mr. Sokolove")

---

[9]Although mitigation banks have existed for some time, their use apparently increased following the adoption of new standards in 2008. *See* United States Environmental Protection Agency & United States Army Corps of Engineers Wetlands Compensatory Mitigation Rule fact sheet, https://www.epa.gov/sites/production/files/2015-08/documents/mitigation_rule_factsheet.pdf ("On March 31, 2008, the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (the Corps) announced innovative new standards to promote no net loss of wetlands by . . . increasing the effective use of wetland mitigation banks . . . ." (last accessed Nov. 6, 2017).

10

and Douglas Wise ("Mr. Wise"). Mr. Sokolove is a lawyer who has been involved in wetland mitigation banking for over twenty years.[10] Mr. Sokolove valued only the wetlands portion of the Take Property. He testified that, in valuing the portion of the property that had the potential to be used for a mitigation bank,[11] he first "looked at . . . *the overall value of the credits available* – stream and wetland; and . . . concluded that the overall value [was] $5,069,000." (Emphasis added). From that amount, Mr. Sokolove deducted the cost of creating the mitigation bank. Mr. Sokolove indicated that these costs involved construction costs, engineering/design costs, and maintenance and monitoring costs. He stated that, after deducting those costs *from the overall value of the stream and wetland credits available*, he arrived at a value of $3,551,000, which he found to be the existing value of the stream and wetlands portion of the Take Property as of the March 20, 2012, date of take. Thus, the sole basis of Mr. Sokolove's valuation, *i.e.*, the amount from which he deducted the costs of creating a mitigation bank to arrive at a final value, was *the market price of mitigation credits* that could be created from the Take Property.

---

[10]Mr. Sokolove based his valuation, in part, upon a "Stream Assessment, Wetland Delineation, and Mitigation Potential" report prepared by Rummel, Klepper, & Kahl, LLP ("RK&K"), and the related testimony of Justin Reel ("Mr. Reel"). Mr. Reel is an environmental scientist, professional wetland scientist, and manager in RK&K's transportation department. According to his curriculum vitae, Mr. Reel is responsible for managing, coordinating, and developing wetland and stream mitigation sites.

[11]As previously stated in note 4 *supra,* CDS expert Douglas Wise determined that the highest and best use of a portion of the Take Property that is not wetlands would be recreational use.

Mr. Wise provided testimony as to the value of the entire Take Property. He stated that he identified and valued the upland areas himself,[12] and he performed some calculations on Mr. Sokolove's valuation of the wetlands portion of the Take Property to arrive at a value for the entire Take Property. Mr. Wise was clear that he had no expertise in valuing wetlands and he, therefore, relied upon the value Mr. Sokolove placed on the wetlands in reaching his ultimate conclusions as to the fair market value of the Take Property. Mr. Wise additionally assigned a value for damage to the residue of CDS's land, part of which also contained wetlands.[13] After performing his calculations and applying a six percent discount rate, Mr. Wise estimated the value of the Take Property to be $2,685,000. He estimated damage to the residue at $2,090,000. Thus, combining these two figures, he estimated total just compensation to be $4,775,000.

As we noted above, "[t]he measure of just compensation to be awarded to one whose interest in real estate is taken for a public use in a condemnation proceeding is *the fair market value of the property at the time of the taking*." Syl. pt. 1, *Western Pocahontas,* 236 W. Va. 50, 777 S.E.2d 619 (emphasis added). In *Western Pocahontas*, we further explained that

---

[12]Mr. Wise testified that he used the sales comparison approach in estimating the value of the uplands.

[13]It appears that the wetlands portion of the residue of the CDS land also was valued based upon the market price for mitigation credits.

The market value must be fair not only to the owner of the interest in the condemned real estate, but also fair to the public paying for the acquisition. The fair market value of the property taken has been defined as: "[T]he price for which *the land* could be sold in the market by a person desirous of selling to a person wishing to buy, both freely exercising prudence and intelligent judgment as to its value, and unaffected by compulsion of any kind." [Syl. pt. 5, *Wheeling Elec. Co. v. Gist*, 154 W. Va. 69, 173 S.E.2d 336 (1970).]

*Id.* at 61-62, 777 S.E.2d at 630-31 (emphasis added; footnotes omitted). There is little authority on how to value land when its highest and best use is the potential to be utilized as a wetlands mitigation bank.[14] In the instant case, CDS experts based their appraisal of the wetlands portion of the Take Property on the value of the stream and wetland mitigation credits they determined would ultimately be generated therefrom.[15] However, such an

---

[14]DOH contends that the circuit court erred by allowing CDS to offer evidence that the fair market value of the property, or any part of it, flowed from the property's highest and best use as a wetlands mitigation bank because a wetlands mitigation bank does not constitute a cognizable property interest. In support of its argument, DOH relies exclusively on the case of *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326 (Fed. Cir. 2012). Because this case is distinguishable from the instant matter, we reject DOH's argument. The issue in *Hearts Bluff* involved whether the denial of a permit to create a wetlands mitigation bank by the United States Army Corps of Engineers amounted to a taking for Fifth Amendment purposes of a property right belonging to the landowner. In rejecting this argument, the Federal Circuit Court of Appeals reasoned that "[o]wning land in and of itself does not give rise to a right to run a mitigation bank, and obtaining a mitigation *instrument* is therefore not a cognizable property interest." *Id.* at 1331 (emphasis added). In the instant matter, unlike *Hearts Bluff*, there is no dispute over whether there was a taking of property. The issue in the case *sub judice* relates to how the taken property should be valued.

[15]CDS asserts that Mr. Sokolove reviewed credit sales from more than 100 existing mitigation banks that were comparable to the bank that Mr. Sokolove believed could be developed on the Take Property. Based upon this data, Mr. Sokolove prepared an estimate *of the total net value of the wetlands credits and stream mitigation credits* that would have

(continued...)

13

appraisal method does not ascertain the fair market value of the land, itself, in an arms-length transaction at the time of the taking. *See Western Pocahontas*, 236 W. Va. at 61-62, 777 S.E.2d at 630-31 (defining fair market value).

Indeed, in the *Southeast Timberlands* case discussed *supra*, the Georgia Court of Appeals observed that the wetlands at issue in that case had not been valued based upon the worth of mitigation credits, thereby indicating that such an assessment would be improper. In this regard, the *Southeast Timberlands* court explained

> [Southeast Timberlands' expert] merely testified that the land's highest and best use was as a wetlands mitigation bank. . . . [H]e did not estimate how much income the land would generate if it operated as a wetlands mitigation bank. *And the trial court excluded testimony from another of Southeast's witnesses about how much the mitigation credits would be worth.* Thus, contrary to DOT's assertions, [the expert's] testimony about how many mitigation credits the land could yield simply explained and reinforced his determination of the land's highest and best use; it was not a post-taking valuation of the land. Moreover, [the expert] did not assume that the land already had been developed into a wetlands mitigation bank. To the contrary, he testified that the land would need to be restored to its original wetlands state, and he explained the costs associated with restoration and maintenance.

263 Ga. App. at 809, 589 S.E.2d at 580 (emphasis added; footnote omitted).

---

[15](...continued)
been associated with the Take Property had it been used as a mitigation bank.

In discussing just compensation, this Court explained in *Western Pocahontas* that

> [t]he challenge in assessing just compensation in a condemnation case is this: what uses and factors would be considered in setting the market price by a willing buyer and a willing seller, each acting with complete freedom and knowledge of the property? "[E]very element of value which would be taken into consideration between private parties in a sale of property should be considered in arriving at a just compensation for the land proposed to be taken[.]" [Syl. pt. 1, *Norfolk & W. Ry. Co. v. Davis*, 58 W. Va. 620, 52 S.E. 724 (1906).] Conversely, "[c]onsiderations that may not reasonably be held to affect market value are excluded." [*United States v. Sowards*, 370 F.2d 87, 90 (10th Cir. 1966).] Essentially, any factor that a reasonable buyer or seller would typically consider should be included in an analysis of fair market value.
>
> Thus, for the purpose of determining the market value of property taken by eminent domain,
>
> > consideration should be given to every element of value which ordinarily arises in negotiations between private persons with respect to the voluntary sale and purchase of land, the use made of the land at the time . . . it is taken, its suitability for other uses, its adaptability for every useful purpose to which it may be reasonably expected to be immediately devoted, and the most advantageous uses to which it may so be applied.
>
> [*West Virginia Dep't of Highways v. Berwind Land Co.*, 167 W. Va. 726, 733, 280 S.E.2d 609, 614 (1981) (quoting Syl. pt. 7, in part, *Strouds Creek & M.R. Co. v. Herold*, 131 W. Va. 45, 47, 45 S.E.2d 513, 516 (1947)).]

*Western Pocahontas*, 236 W. Va. at 62-63, 777 S.E.2d at 631-32 (footnotes omitted).

15

Based upon our analysis in *Western Pocahontas,* we now hold that, when valuing wetland property for the purpose of just compensation in a condemnation proceeding, the highest and best use of the property as a mitigation bank may be considered to the extent that such a factor would be weighed in negotiations between private persons participating in a voluntary sale and purchase of the land at the time it was taken. However, the market price of mitigation credits that ultimately may be produced from the property cannot be the sole basis for measuring the land's value in determining just compensation. *See, e.g.*, Wayne Rasmussen, *The Growing Demands for Wetlands: Should a New Class of Land Use Be Considered When Determining Highest and Best Use?*, Right of Way, 22, 24-25 (May/June 2011) ("If the appraiser feels that wetlands may potentially be the highest and best use for all or a portion of the project take, then the next step is to investigate *the price of comparable land* that was recently sold to non-government entities by local area conservation banks. . . . If the resulting *per-acre price* as wetlands turns out to be higher than the appraiser's alternative highest and best uses, then wetlands can be considered as the actual highest and best use for the area of the take. This can then be identified as a specific class of land use separate from the undevelopable open space classification." (emphasis added)).

Because the CDS experts improperly valued the Take Property based solely upon the market price of mitigation credits, we find the circuit court erred in admitting that testimony. We therefore reverse this case and remand for a new trial.

16

**IV.**

**CONCLUSION**

Based upon the foregoing analysis, we reverse the November 15, 2016, order of the Circuit Court of Tucker County and remand this case for a new trial consistent with this opinion.

Reversed and Remanded.